IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Lisa J. Priester, Individually, and as Personal Representative of the Estate of David A. Priester, Jr., | ) ) ) | C/A No. 2:14-cv-01108-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **Plaintiff's Memorandum in Opposition** |
| | ) | **To Defendant Futuramic Tool &** |
| Futuramic Tool & Engineering Company; | ) | **Engineering Company's Motion for** |
| Capital Welding, Inc.; Intec Automated | ) | ***Partial* Summary Judgment and** |
| Controls, Inc.; and SAR Automation, L.P., | ) | **Defendant Capital Welding, Inc.'s** |
| | ) | **Motion for *Complete* Summary** |
| | ) | **Judgment.** |
| Defendants. | ) | |

Plaintiff, Lisa J. Priester ("Mrs. Priester"), Individually, and as Personal Representative of the Estate of David A. Priester, Jr. ("Mr. Priester"), by and through the undersigned counsel, respectfully submits this Memorandum in Opposition to the both the Motion for Partial Summary Judgment of Defendant Futuramic Tool and Engineering Company ("Futuramic") and the Motion for Complete Summary Judgment of Defendant Capital Welding, Inc. ("Capital").[1]

## I.    INTRODUCTION

This litigation arises out of a fatal incident which claimed the life of Mr. Priester on March 18, 2013, while he was working at the Boeing facility in North Charleston ("the Incident"). On the night of the Incident, Mr. Priester was working on an elevated work platform (hereinafter "Cell 90") while helping assemble the barrel section of an airplane fuselage ("the barrel"). *See e.g.* Ex. 1, Report of Daryl L. Ebersole, P.E., at 1. Cell 90 features "deployable deck panels," alternatively

---

[1] *See* Futuramic's Mot. and Mem, Dkt. Nos. 75 and 75-1, and Capital's Mot. and Mem., Dkt. Nos. 76 and 76-1. As Futuramic and Capital are represented by the same counsel and their supporting memoranda are identical, Plaintiff has responded to both motions in a consolidated fashion. Unless otherwise noted, the term "Defendants" shall refer to both Futuramic and Capital.

referred to as 'sliders,' which can extend "to create a working/walking surface" along the contour of the barrel. *See* Ex. 2, Report of Bartley J. Eckhardt, P.E., at 2. Cell 90 has 18 such sliders. *Id.* at 5. On the night of the Incident one of those sliders, Slider No. 2, "failed to extend when requested." *See* Ex. 1 at 26. Although Slider No. 2 failed to fully extend, "[w]here was no physical barrier or active warning preventing the crew, including Priester, from accessing the walking working surface" that had been created by the deployment of the remaining 17 sliders. *See* Ex. 2 at 8. As a result, there was "an unguarded opening in the walking/working surface." *Id.* During the Incident, Mr. Priester "was fatally injured when he was unnecessarily and unreasonably exposed to the hazard of a fall from height through an unguarded floor opening." *Id.* at 9.

Mrs. Priester has brought suit against Futuramic and Capital,[2] alleging product liability claims sounding in negligence and strict liability, as well as a claim for loss of consortium. *See* Dkt. No. 48, Pl.'s Am. Compl. Mrs. Priester has also brought suit against Intec Automated Controls, Inc. ("Intec") and SAR Automation, L.P. ("SAR"). *Id.* Futuramic has now moved for summary judgment on Plaintiff's strict liability claims; Capital, however, seeks summary judgment on all of Plaintiff's causes of action. *See* Dkt. No. 75-1 at 2.

As detailed below, Plaintiff opposes these motions. Futuramic's arguments in favor of *partial* summary judgment should be rejected as (1) there is a genuine issue of material fact as to the existence of design, manufacturing and warning defects within Cell 90 when delivered to and assembled at Boeing by the Defendants; (2) whether the Plaintiff's putative knowledge of the gap arising from Slider No. 2's failure to deploy, and the risks associated therewith, are sufficient to bar recovery are questions for the jury; and (3) any changes made to Cell 90 after its delivery were

---

[2] Of note, Futuramic has admitted that it "manufactured Cell 90." *See* Dkt. No. 75-1 at 2. Capital has admitted that it "performed the fabrication work for Cell 90." *See* Dkt. No. 76-1 at 2.

both foreseeable to Futuramic and to Capital, given the device's state when delivered to Boeing. Likewise, Capital's arguments in favor of *complete* summary judgment should be rejected because, in addition to the foregoing reasons identifying the insufficiency of Futuramic's positions, Capital owed the Plaintiff's decedent a duty of reasonable care. As such the Defendants' motions should be denied.

## II.    FACTS
### A.    Cell 90, Futuramic & Capital

 "Boeing contracted with Futuramic to design and manufacture" Cell 90. *See* Ex. 2 at 2. Cell 90 was "designed, manufactured and introduced into the stream of commerce by Futuramic, Inc." based upon a "descriptive specification" issued by Boeing. *See* Ex. 2 at 1;3 (citing PME 473Z5000-7 Specifications, Bates No. Boeing 000105 et seq, Ex. 3.). "Futuramic designed the mechanical parts of the systems and used resources in their fabrication division, Capital Welding, for fabrication and assembly" of Cell 90. *See* Ex. 1 at 3. Accordingly, "Futuramic was the 'integrator' and 'supplier'" of Cell 90 and "and its intended role in the design, manufacture, realization and commissioning of the product was 'As an entity that designs, provides, manufactures or assembles a machine, its associated machines or equipment, the safeguarding, control interfaces, interconnections or the control system into a machinery system.'" *See* Ex.4, Aff. Of Bartley J. Eckhardt, P.E., ¶7 (citing ANSI B11.0-2010 Safety of Machinery- General Requirements and Risk Assessment, at 18). Likewise, Capital "was the 'manufacturer', or 'Supplier' and its intended role in the design, manufacture, realization and commissioning of the product was to provide 'equipment' or 'services.'" *See* Ex. 4*, ¶ 8.

Boeing expected that Cell 90, when delivered to it, would meet "the ANSI A.92.6 Self Propelled Elevating Work Platforms standard;" indeed, compliance with that standard "was a specific requirement in the Boeing specifications." *See* Ex.5, Aff. of Daryl L. Ebersole, P.E., ¶¶

17-18. The terms agreed to by Futuramic and Capital denoted that they would "train Boeing personnel at the Charleston, SC site, building 88-19, in the operation and maintenance of the tool." *See* Ex. 3, § 11.13. Moreover, Cell 90 was intended to "have motor driven sliders that would move toward the fuselage and provide a surface to stand on that would have no gaps larger than 3" between the end of a slider and the barrel section." *See* Ex. 1 at 3.  In addition, each slider present on Cell 90 was required to have "an adjustable slider edge, even when each slider was fully deployed," as this was "an express design requirement" set forth by Boeing. *See* Ex. 4, ¶ 18.

Providing the logic software to control the operations of Cell 90 "was part of the contract" between Boeing and Futuramic. *See* Ex. 6, Scott Motz (Boeing) Dep. at 106:10-12. Boeing expected Futuramic to provide robust, reliable and safe computer logic as part of the manufacture and sale of Cell 90. *Id.* at 96:13-18. Oversight of subcontractors involved in the production of Cell 90 was the responsibility of Futuramic. *Id.* at 32:7-13. Futuramic initially hired non-party "Matthews for the design of the control and electrical systems;" however, due to scheduling issues, Futuramic subsequently retained Intec to prepare "the programming for the controllers, drives and touch screen" on Cell 90. *See* Ex. 1 at 3-4.

 "At the time Cell 90 was delivered to Boeing, the design and manufacture of the product was incomplete as it lacked finished control logic and slider sensors that actually detected the barrel." *See* Ex. 4, ¶ 36. Indeed, "[a]s delivered to Boeing," Cell 90's logic controls "were incomplete, contained NOPs, and was in a condition which would neither activate an alarm nor prevent the motion of the sliders, contrary to the design intent and Boeing's specifications." *Id.*, ¶ 44. Specifically, at the time Cell 90 was delivered to Boeing by Futuramic and Capital, the software within the device "lacked logic for detecting communication failure that would result in motion failure of a slider." *See* Ex. 5, ¶ 9.

As delivered to Boeing, Cell 90's logic contained "'NOPs' or 'No Operation' instructions," which "were used as placeholders during the development of the logic programs for the use on Cell 90." *See* Ex. 5, ¶ 10. Indeed, "[a]t the time of delivery by Futuramic/Capital Welding, there were at least 40 instances of 'NOPs' within the software code." *Id.* "These NOPs represented incomplete branches in the software which were intended to be completed upon delivery to Boeing by the original programmer Intec." *Id.* As a result of these NOPs within the logic for Cell 90, "[a]s delivered to Boeing, and before any work by others, the software lacked communication verification logic," meaning that in that as-delivered state "no alarm would occur as a result of the slider drive number 2 not responding." *Id.,* ¶ 13. Moreover, given the incomplete software provided by Futuramic and Capital, the "ANSI A92.6 Self Propelled Elevating Work Platforms standard was not met at the time of delivery to Boeing." *Id.*, ¶ 11.

In addition, "as designed, manufactured and integrated by Futuramic and Capital Welding, each slider present on Cell 90 lacked an adjustable slider edge, even when each slider was fully deployed, which was an express design requirement specified by Boeing in its tool specifications documentation." *See* Ex. 4, ¶ 18 (citing Bates BOEING000112, the Tool Specifications: PME473Z5000-7 revision date: 9/18/12 at 8, § 3.4.1.3.2.1.).[3] John Couch, a non-engineer official of Futuramic, was the person who signed off on the project's design. *See* Ex. 1 at 3-4. On or about September 12, 2012 the final Statement of Work ("SOW") for Cell 90 was signed off on by Boeing. *See* Ex. 3, *passim.* Preliminary testing of logic was performed at a Capital facility in Michigan prior to delivery of the product to Boeing. *See* Ex. 1 at 4. In addition, as discussed below, on or about October 2, 2012, Boeing issued an SOW for the addition of a redundant brake system for

---

[3] *See also* Ex. 2 at 7 (noting that "Boeing also required the toe kicks on each slider to be adjustable to the contour of the fuselage. Futuramic failed to incorporate this required feature, which created loss of balance and trip hazards at the end of each toe kick.").

Cell 90. *See* Ex. 6 at 87:25-89:16; *see also* Ex. 7, 10/2/2012 Mem. from Walt Converse to Stacy Lovett and Scott Motz. Although Boeing provided Futuramic with a request for a quote for this additional work, Futuramic ultimately only provided interface and cooperation to another company, SAR, which was retained to add the redundant braking system. *Id.* at 89:17-90:25.

Cell 90 was delivered to Boeing's North Charleston plant in November 2012. *See* Ex. 1 at 4. Capital "made the schedule for the commissioning" of Cell 90, which included provisions for "training for the operators of the system." *See* Ex. 2 at 4. Two Capital employees, Dan Smallwood and Dustin Martin, were involved in the commissioning of Cell 90 at the Boeing facility. *See* Ex. 8, Dep. of Jim Worthington (Capital) at 64:18-15. Nonetheless, "[w]hile taking an active part in the commissioning," Capital and Futuramic's lead service technician Dan Smallwood "left for vacation during the set-to-work," leaving that process "in the hands of an inexperienced coworker." *See* Ex. 2 at 18. Indeed, "Dustin Martin," the official who was charged with "the training of Boeing employees in the functionality, operation, and control of the sliders, testified that he neither had the proper training himself nor any instructional materials, manuals or handouts to leave behind" at Boeing on the proper operation of Cell 90. *Id.* at 24. Mr. Martin had never been involved installing similar platforms at Boeing prior to November 2012. *See* Ex. 9, Dustin Martin Dep., 15:23-16:20. It was not anticipated that Mr. Martin would be left alone to ensure Cell 90's start-up operations without additional colleagues, including Mr. Smallwood. *Id.*, 20:3-16. Per Mr. Martin, two officials from SAR were present at Boeing while he undertook his activities in November 2016. *Id.*, 27:25-28:11.

Cell 90 was not put into production use until after both the delivery and assembly by Capital, as well as SAR's operations, had been completed. *See* Ex. 10, Dep. of Walter Converse (Boeing), at 93:17-25. However, shortly after the completion of the commissioning, on December

4, 2012, Boeing contacted Futuramic, noting that an "Urgent Correction [was] Needed" as "[t]he sliders are not stopping and driving into composite material and the metallic barrel cart ending. Need help immediately to troubleshoot and resolve this issue on site Boeing South Carolina." *See* Ex. 11, Bates No. Futuramic002267-002268. Despite this request for urgent assistance from Boeing in December 2012, Futuramic did not resolve that issue before the Incident in March 2013. *See* Ex. 12, Dep. of Thomas Blum (Futuramic) at 128:16-23 (noting that as of the time of the Incident "the solution wasn't put in place but it was in process going through.")

B. **SAR's Activities**

On or about October 2, 2012, *prior* to the placement of Cell 90 into the stream of commerce or its acceptance by Boeing at the North Charleston facility, Boeing issued an SOW for the addition of a redundant brake system for Cell 90. *See* Ex. 6 at 87:25-89:16; *see also* Ex. 7. Boeing "provided [Futuramic] a request for quote" on this additional work. *See* Ex. 6 at 89:17-20. However, Futuramic told Boeing that, were they to perform that work, that it would delay the "production rate schedule" for Cell 90. *See* Ex. 10 at 89:19-90:8. As a result, SAR was brought in to provide this redundant brake system. *See* Ex. 6 at 90: 90-21.

Futuramic nevertheless provided SAR "access into their system," meaning that they provided interface, information and cooperation for another entity to perform the installation of the redundant brake controls. *See* Ex. 6 at 89:25-90:20. As part of that cooperative process, "Futuramic/Capital Welding knew of, and facilitated, the transfer of the as-delivered, incomplete logic software to SAR so that modification and commissioning of Cell 90 could go forward." *See* Ex. 5, ¶ 24 (citing Ex. 13, attached hereto, Bates No. Futuramic 001628 *and* Ex. 14 attached hereto, 11/26/12 email from Scott Kruger of Intec to Nick Lashkarev and Michael Ellison of SAR, Ron Naz of Intec and Tom Blum of Futuramic.). Futuramic was also aware that SAR was present onsite

7

at the Boeing facility when Mr. Smallwood and Mr. Martin were also present at Boeing, after the product was delivered, representing the interests of Futuramic and Capital. *See* Ex. 12 at 128:2-7.

**C.  The Plaintiff's Employment & Training.**

Mr. Priester was hired as a full-time Boeing employee on February 22, 2013, sixteen days prior to the Incident. *See* Ex. 15, Boeing's Investigation and Incident Review Board Report at 15. Mr. Priester had previously worked at the Boeing facility for a contractor, Moseley, beginning in August 2012. *Id.* Mr. Priester's coworker Richard Pullam noted that, as of the night of the Incident, Mr. Priester "had what we call a blue badge," denoting his relative lack of experience working on Cell 90. *See* Ex. 16, Pullam Dep. at 112:25-113:1.

While Mr. Priester completed various on-the-job training courses, his supervisor, Mr. Lee Kirkland, confirmed that he was not required to have completed, and did not complete, a training course known as Slips Trips and Falls (TR000171) in order to work on Cell 90. *See* Ex. 17, Kirkland Dep., 45:24-46:6. Per Mr. Kirkland, Mr. Priester regularly followed orders and instructions and was never observed doing anything unsafe. *Id.* 86:20-87:2. Likewise, Mr. Kirkland never had any "individual[] one on one" conversations with Mr. Priester where he told him to not venture onto the sliders unless all 18 were extended, nor are there any documents which can substantiate if, or when, any such instructions were given to Mr. Priester as a member of a larger group. *Id.* at 74:19-75:20. Similarly, Mr. Battle, another Boeing employee, has testified that prior to the Incident, he was never told, nor did he ever witness anyone tell Mr. Priester not to go out onto Cell 90 unless all of the sliders were extended. *See* Ex. 18, Battle Dep. 35:22-36:222.

**D.  The Incident**

On March 18, 2013, Plaintiff and three co-workers were on the second shift crew assigned to Cell 90. *See* Ex. 15 at 5. The three colleagues working with Mr. Priester on the second shift were Tony Peters, Justin Bunch, and Richard Pullam. *Id.* at 228.  At 9:00 p.m., Mr. Priester and his three

colleagues took their scheduled break, returning at 9:20 p.m. *Id.* at 227. Upon returning from break, "Slider number 2 failed to extend when requested." *See* Ex. 1 at 26. Mr. Pullam and Mr. Peters attempted to get Slider No. 2 to extend but were unsuccessful in that process. *See* Ex. 16, Pullam Dep. at 153:7:25.  Mr. Priester did not attempt to utilize the pendant device on Cell 90 to attempt to make Slider No. 2 extend. *See* Ex. 16, Pullam Dep. at 153:7:25.

As noted by Mr. Eckhardt, "[i]mmediately prior to the incident, and as designed, manufactured and integrated by Futuramic and Capital Welding, Cell 90 was not a fully enclosed workspace." *See* Ex. 4, ¶ 14. "Moreover, there were no interlocked physical barriers or active warnings provided in order to caution against the absence of a fully enclosed workspace immediately prior to the incident." *Id.* While in the process of working on Cell 90, Mr. Priester "fell through the unguarded floor opening after a loss of balance, and/or he tripped on exposed toe kick." *See* Ex. 2 at 8.  As a result of injuries sustained during the Incident, Mr. Priester passed away on March 29, 2013.

While employees are able to enter a work order known as a "Maximo" when encountering an on-the-job problem, it was standard procedure that Boeing's workers would attempt to troubleshoot issues with sliders without entering a Maximo "[p]robably 75 percent of the time." *See* Ex. 16 at 167:13-25. Moreover, in the minority of situations where a Maximo was issued, Mr. Priester's supervisor Mr. Kirkland noted that entry of such an order, without more, does "nothing to tell me, hey, a Maximo just got in." *See* Ex. 17 at 47:13-48:4. Indeed, had a Maximo been entered, Mr. Kirkland would not have automatically received notice. *Id.* at 49:13-18.

 Furthermore, it "wasn't [part of] training" for workers on Cell 90 to contact supervisors, such as Mr. Kirkland, after a Maximo had been entered. *See* Ex. 16 at 167:2-6; 166:5-10. Significantly, there was no defined obligation or requirement for Mr. Priester, specifically, to enter a Maximo after the failure of Slider No. 2. *Id.* at 151:16-19. Moreover, Mr. Bunch testified that it

was not unusual for employees to continue working when one of the sliders was not fully extended. *See* Ex. 19, Bunch. Dep., at 104:20-106:1.

In addition, Mr. Pullam has testified that he has no recollection of ever discussing the gap created by Slider No. 2 as posing a risk of a 'fall hazard' with Mr. Priester, nor did he recall any conversation amongst he and his co-workers about not working in the vicinity of Slider No. 2 because of a fall risk. *See* Ex. 16 at 156:13-21. Likewise, when asked if the failure of Slider No. 2 to fully extend created a gap large enough for someone to fall through, Mr. Bunch noted in pertinent part, "You wouldn't think so…." *See* Ex. 19, Bunch Dep., at 86:17-20.  Similarly, Mr. Bunch did not recall any specific statements made by Mr. Priester before the Incident which identified the gap created by Slider No. 2 as a fall hazard, or any statements by Mr. Priester about the gap at all. *Id.* at 121:16-22. Furthermore, per Mr. Battle, even if there was a fall hazard present, to his knowledge there was no requirement for the use of a fall harness or other protective equipment. *See* Ex. 18 at 78:23-79:6.

Both Boeing and the South Carolina Department of Labor Licensing, and Regulation's Occupational Safety and Health Administration ("SC OSHA") conducted inquiries in the aftermath of the Incident. *See* Ex. 15, *passim* (Boeing's Report); *and see* Ex. 20, Letter from Anthony Willis, OSHA Compliance Manager, to Thomas Deem, Boeing (July, 23, 2013). As noted by SC OSHA, "we found no violations of the South Carolina Rules and Regulations existed regards [sic] to accident itself." *See* Ex. 20.

## III.    LEGAL STANDARDS
### A.  <u>Summary Judgment Standard</u>

Pursuant to Fed. R. Civ. P. 56, summary judgment should not be granted if there exists a "dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Prop.*, 810 F.2d 1282, 1286 (4th Cir. 1987). When considering

a motion for summary judgment, the court must construe all evidence and inferences in a light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Therefore, "all that is required [to defeat summary judgment] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* Summary judgment "should be cautiously invoked so that no person will be improperly deprived at trial of disputed factual issues." *Baughman v. Am. Tel. and Tel. Co.,* 306 S.C. 101, 410 S.E.2d 537 (SC 1991).

### B. <u>South Carolina Products Liability Law</u>

Under South Carolina Law, in order to find liability on behalf of the manufacturer under any products liability theory, the plaintiff must show: (1) he was injured by the product; (2) the injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) that the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant. *Bragg v. Hi-Ranger, Inc.,* 319 S.C. 531, 538, 462 S.E.2d 321, 326 (Ct. App. 1999); *Madden v. Cox,* 284 S.C. 574, 328 S.E.2d 108 (Ct. App. 1985). S.C. Code Ann. § 15-73-10(1)(b) imposes strict liability on the manufacturer of a defective product, provided that the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." S.C. Code Ann. § 15-73-10(1) (b); *see also Ervin v. Cont'l Conveyor & Equip. Co.,* 674 F. Supp. 2d 709, 723 (D.S.C. 2009). Under any products liability theory, the plaintiff must show that a product defect was a proximate cause of his injuries. *See Small v. Pioneer Mach., Inc.,* 329 S.C. 448, 494 S.E.2d 835, 842 (Ct. App. 1998). However, "[p]roximate cause does not mean the sole cause." *Id.* (citing *Wallace v. Owens-Illinois, Inc.,* 300

S.C. 518, 389 S.E.2d 155 (Ct. App. 1989). Indeed, a "defendant's conduct can be *a* proximate cause if it was at least *one of* the direct, concurring causes of the injury." *Id.*

Moreover, S.C. Code Ann. § 15-73-20 provides an affirmative defense to product liability claims, noting that "*If* the user or consumer *discovers the defect **and** is aware of the danger*, and nevertheless *proceeds unreasonably* to make use of the product and is injured by it, he is barred from recovery." *See* S.C. Code Ann. § 15-73-20 (emphasis added). As noted by the South Carolina Supreme Court, "[t]he plain language of section 15–73–20 requires a defendant in a product liability action to prove, among other things, that the plaintiff proceeded *unreasonably* to make use of the product." *Koester v. Carolina Rental Ctr., Inc.,* 313 S.C. 490, 494, 443 S.E.2d 392, 394–95 (1994) (emphasis in original). Nevertheless, whether the "use of the product was unreasonable is a question of fact for the jury." *Id.; accord White v. Renaissance Hotel Mgmt. Co., LLC*, No. 2:14-CV-02866-DCN, 2016 WL 234987, at *3 (D.S.C. Jan. 20, 2016)[4] (noting that "the defense of assumption of risk 'ordinarily present[s] [a] question[ ] of fact to be determined by a jury and only rarely become[s] [a] question[ ] of law for the court to determine.'" (internal citations omitted).

South Carolina courts have also noted that "if it can be shown that a product was (1) materially altered before it reached the injured user and (2) such alteration could not have been expected by the manufacturer or seller, then the manufacturer or seller is not liable." *Ervin*, 674 F. Supp. 2d at 723 (*citing Fleming v. Borden*, 316 S.C. 452, 450 S.E.2d 589, 592-92 (1994); *Kennedy v .Custom Ice Equip. Co., Inc.,* 271 S.C. 171, 246 S.E.2d 176 (1978)). However, the South Carolina Supreme Court has added that when "an alteration to the product is shown, it is sometimes forgotten that the foreseeability of the alteration must also be examined." *Fleming*, 450 S.E.2d at

---

[4] Please see Ex. 21, attached hereto.

593. Thus, "in a products liability case, liability may be imposed upon a manufacturer or seller notwithstanding subsequent alteration of the product when the alteration *could have been anticipated* by the manufacturer or seller." *Small v. Pioneer Mach., Inc.,* 329 S.C. 448, 494 S.E.2d 835, 844 (Ct. App. 1998) (emphasis added). As such, where there is a "legitimate dispute as to the foreseeability of a modification, South Carolina courts have consistently held that the resolution of the dispute is properly for a jury." *Ervin*, 674 F. Supp. 2d at 724 (citing *Kennedy*, 246 S.E.2d at 178); *see also Fleming*, 450 S.E.2d at 593; *Small*, 494 S.E.2d at 844).

## IV.    ARGUMENT

The motions for summary judgment brought by Defendants Futuramic and Capital should be denied, as detailed herein. First, genuine issues of material fact exist on the issue of whether Futuramic's and Capital's actions were proximate causes of defects within Cell 90 which caused or contributed to Mr. Priester's injuries and death. Second, Plaintiff vigorously disputes Defendants' assertions about Mr. Priester's knowledge and appreciation of not only the gap arising from Slider No. 2's failure to deploy, but also and the risks associated therewith. Third, despite Defendants' assertions that changes made to Cell 90 after its delivery should serve to insulate them from liability for Plaintiff's claim, the question of whether any such changes were foreseeable to the Defendants' renders entry of summary judgment inapposite. Finally, in addition to the foregoing reasons identifying the insufficiency of the Defendant's arguments with respect to Plaintiffs' strict liability claims, Capital's motion for summary judgment on Plaintiff's negligence claims should be denied because it owed the Plaintiff's decedent a duty of reasonable care.

### A.    **There Is A Genuine Issue of Material Fact As To Whether Cell 90 Was in a Defective Condition and  Was Unreasonably Dangerous When It Was Delivered and Installed At Boeing by Futuramic and Capital**

#### 1.    *Manufacturing Defect*

Defendants first assert that this court should grant summary judgment on Plaintiff's claims alleging a manufacturing defect in Cell 90. Under South Carolina law, "[a] manufacturing defect claim is an allegation 'that a particular product was defectively manufactured.'" *Fisher v. Pelstring,* 817 F. Supp. 2d 791, 836 (D.S.C. 2011), *on reconsideration in part* (Jan. 11, 2012) (citing *Watson v. Ford Motor Co.,* 389 S.C. 434, 699 S.E.2d 169, 174 (2010). In *Fisher*, Judge Wooten noted that courts have identified a "manufacturing defect as existing 'when a product does not conform to the design standards and blueprints of the manufacturer and the flaw makes the product more dangerous and therefore unfit for its intended or foreseeable uses.'" *Id.* at 818 (citing *Gerber v. Hoffmann–La Roche Inc.,* 392 F.Supp.2d 907, 922 (S.D.Tex.2005)). *Accord* F.P. Hubbard & R.L. Felix, The South Carolina Law of Torts 299 (3d ed. 2004) (noting that manufacturing "defects result when the final product does not conform to specifications.")

Here, Defendants argue they are entitled to summary judgment on Plaintiff's manufacturing defect claims on the supposed basis that Plaintiff has adduced no evidence of a mechanical defect with Cell 90. *See* Defs.' Mem. at 11-12.[5] Defendants' arguments on this point are untenable: not only do they fail to cite any authority for their implicit assumption that a manufacturing defect *must* be predicated on a mechanical defect, but they also ignore the wealth of evidence offered by the Plaintiff showing ways in which Cell 90 did not conform to its intended specifications and criteria.

---

[5] On this point the Defendants also reference conclusions made by their expert witness, Brian Durig, contained in a heading on page 3 of his Rule 26 Report, which merely states that "The PME was not Defectively Designed or Manufacture." *See* Defs.' Mem. at 12 (citing Exhibit L thereto). Despite all parties' best efforts, Mr. Durig will not be deposed until Tuesday, August 30, 2016. Defendants' counsel Mr. Rozelsky has agreed in the attached email that, in lieu of filing a Fed. R. Civ. P. 56(d) affidavit, the Plaintiff may supplement this response once a copy of Mr. Durig's transcript becomes available. See Ex. 22, Email from Kurt Rozelsky to Kevin R. Dean (Aug, 25, 2016).

Defendants assert that Plaintiff cannot establish a manufacturing defect because Mr. Eckhardt did not identify evidence showing "that Slider 2 failed to work because of a mechanical issue." *See* Defs.' Mem. at 11-12. Defendants' position ignores the fact, clearly noted in Mr. Eckhardt's Report, that Cell 90 did not comport with Boeing's intended criteria "requiring toe kicks on each slider to be adjustable to the contour of the fuselage." *See* Ex. 2 at 7. Indeed, "as designed, manufactured and integrated by Futuramic and Capital Welding, each slider present on Cell 90 lacked an adjustable slider edge, even when each slider was fully deployed, which was an express design requirement specified by Boeing in its tool specifications documentation." *See* Ex. 4, ¶ 18. Moreover, this failure in the "design, *manufacture* and integration of Cell 90" was "not merely a design choice to *not* incorporate an optional feature to enhance the safety of Cell 90; rather it was a deviation from clear descriptive requirements provided by Boeing." *Id.*, ¶ 19.

Likewise, as noted by Mr. Ebersole, "[a]t the time of delivery by Futuramic/Capital Welding, there were at least 40 instances of 'NOPs' within the software code." *See* Ex. 5, ¶ 10. As a result of these NOPs within the logic for Cell 90, in its as-delivered state "no alarm would occur as a result of the slider drive number 2 not responding" on Cell 90. *Id.*, ¶ 13. Moreover, given the incomplete software provided by Futuramic and Capital, the "ANSI A92.6 Self Propelled Elevating Work Platforms standard was not met at the time of delivery to Boeing." *Id.*, ¶ 11. ANSI A92.6 "was a specific requirement in the Boeing specification," and Futuramic/Capital Welding had a responsibility to deliver a self-propelled elevated work platform that would meet this standard and they failed to do so." *Id.* ¶ 18. Indeed, "Futuramic/Capital Welding delivered an incomplete product to Boeing as a result of the failure to finalize and incorporate logic for detecting communication failure that would result in the motion failure of a slider." *Id.*, ¶ 27. As such, "Cell 90 deviated from its intended design and function." *Id.*

Given the foregoing, Plaintiff has come forward with affirmative evidence showing that, as delivered and manufactured, Cell 90 did not conform to its intended design, which is the hallmark of a manufacturing defect. As such, Defendants' motions should be denied.

### 2. *Design Defect*

Defendants next submit that they are entitled to summary judgment on Plaintiff's design defect claims. In doing so, the sole contention raised by the Defendants is that Plaintiff's design defect claims are predicated on only a theory that "Cell 90 was defective because certain safety features could have been added to it." *See* Defs.' Mem. at 12. Defendants' misapprehend the defect theories at issue and ignore the existence of genuine issues of material fact on the issue of design defect under South Carolina law.

Defendants' efforts to recast a feasible alternative design proposed by Mr. Eckhardt into a basis for summarily disposing of this case under *Marchant v. Mitchell Distrib. Co.*, 240 S.E. 2d 511, 513 (S.C. 1977) and its progeny is unpersuasive. It is true that Mr. Eckhardt has proposed alternative designs, one of which is an "interlocked fence and gate arrangement," which "is technically and economically feasible, state-of-the art, state-of-the-industry, available "off-the-shelf" and ubiquitous in the built industrial environment." *See* Ex. 4, ¶ 71. However, as delivered to Boeing, Cell 90 posed unreasonable risk given the manner in which it was designed.  As noted by Mr. Eckhardt, "[a]t the time Cell 90 was delivered to Boeing, the design and manufacture of the product was incomplete as it lacked finished control logic and slider sensors that actually detected the barrel." *See* Ex. 4, ¶ 36.  Likewise, the logic controls within Cell 90 were incomplete and "in a condition which would neither activate an alarm nor prevent the motion of the sliders, contrary to the design intent and Boeing's specifications." *Id.* ¶ 44.  Indeed, Mr. Eckhardt has explained:

Cell 90 was not only defective and unreasonably dangerous because of (A)

Futuramic's failure to deliver a completed device with functioning slider sensors and control logic, and (B) Futuramic's failure to adhere to Boeing's own criteria in the Tool Specifications: PME473Z5000-7 revision date: 9/18/12 at p. 8, § 3.4.1.3.2.1., but also because it (C) failed to provide interlocked barrier guarding to access the slider portion of the incident platform deprived Mr. Priester protections afforded by the industry and was a cause of Mr. Priester's fatal injury. Indeed, failures (A) and (B) described in the foregoing paragraph actually intensified the need for the Futuramic and Capital Welding to design and manufacture Cell 90 with the highest regard to safety of all who could contract the elevated platform, including Mr. Priester.

*Id.,* ¶¶ 72-23.

Put simply, Plaintiff' has come forward with evidence establishing that as designed and supplied to Boeing by Futuramic and Capital, Cell 90 was *not* in a condition that met Boeing's specifications and *was* in a defective condition which was unreasonably dangerous, irrespective of the presence or absence of the one alternative design discussed in the Defendants' motions. As a result, Defendants' arguments on this point should be rejected.

### 3. *Warnings Defect*

Futuramic and Capital next assert that Plaintiff's defective warning claims should be dismissed, arguing (1) that an adequate warning was provided on Cell 90 and (2) irrespective of the adequacy of the warning putatively provided, that "Plaintiff and his coworkers were aware of the hazards…." *See* Defs.' Mem. at 14-15.  These arguments are meritless.

> i. *Defendants Have Not Established The Existence of An Adequate Warning As a Matter of Law.*

Defendants contend, under *Allen v. Long Mfg. NC, Inc.,* 332 S.C. 422, 505 S.E.2d 354 (Ct.App.1998), that a warning putatively present on Cell 90 on the day of the Incident insulates them from liability as a matter of law. *See* Defs.' Mem. at 15. The only evidence offered in support of this contention is Mr. Motz's testimony regarding a picture of a sign which states "Warning –

Open Areas in Deck. No Admittance Without Authorized Approval."[6] Even assuming that this sign was present on the day of the Incident, its language is insufficient to adequately warn users of Cell 90 of the risks, and consequences of those risks, posed by the potential failures of Cell 90's sliders. As noted by Mr. Eckhardt, "[i]n order to be effective, a warning has to, at the very least, identify the hazard, the potential consequences associated with the hazard, and what actions should be taken to avoid the hazard." *See* Ex. 2 at 27. Here, the language cited by the Defendants references open areas, but does not mention the potential for injury due to fall hazards or the relationship of the sliders to potential gaps.

Significantly, prior to the Incident there were no written warnings which indicated that if one slider stopped work should not continue on Cell 90. *See* Ex. 19, Bunch Dep., 75:8-14. Indeed, "there is no evidence that Mr. Priester alone decided to continue his work duties prior to the incident. As a subordinate part of the crew, Mr. Priester could have regarded his presence on the platform as *authorized*." *See* Ex.4, ¶ 66 (emphasis added). In addition, Mr. Motz testified that he did not "recall if there was a posted sign" which told employees not to go out onto the sliders if they were not all fully extended. *See* Ex. 6 at 81:6-11.  Moreover, the sign does not encompass the specific risk at issue; as recognized by Boeing "[t]here are no specific written work instructions for the Cell 90 tool or its operation….As such, there are no written work instructions stating Caution or Warning notes concerning slider malfunctions." *See* Ex. 15 at 10.

Under South Carolina law, "[t]he adequacy of a warning is generally a jury question." *Curcio v. Caterpillar, Inc.,* 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003) (citing *Allen,* 505 S.E.2d 354).  Indeed, "[o]nce it is established that a product must display a warning to be safe, the question of the adequacy of the warning is one of fact for the jury as long as evidence has been presented

---

[6] *See* Defs.' Mem. at 15 (citing Ex. C, MR_Priester_000048 *and* Ex. A, Motz Dep. 168:8-18).

that the warning was inadequate." *Allen*, 505 S.E.2d at 357. Based on the foregoing, the Defendants have not provided a principled basis to deviate from that rule here. As such, viewing the evidence in the light most favorable to the Plaintiff, Defendants' motions should be denied.

> ii. *Defendants' Had A Duty To Warn.*

By the very terms of the SOW accepted by Futuramic and Capital, the Defendants were obliged to "provide complete instructions for testing, operating, and maintaining the equipment including, warnings and cautions of hazards to people, parts, and equipment." *See* Ex. 3, ¶ 4.1.1; *see also* Ex. 6 at 80:9-25. Nevertheless, Defendants now assert that they had no duty to warn as the danger was "known." *See* Defs.' Mem. at 17. This contention is inaccurate, as there is legitimate dispute over both Mr. Priester's awareness of the gap *and* the risks posed by it. Defendants' contention is also misleading at they repeatedly attempt to impermissibly substitute facts which they posit "the crew" knew, or which they suggest are common knowledge, for actual proof of Mr. Priester's knowledge of the gap and of the risks posed by it. Here, the Defendants misconstrued the relevant inquiry, and their attempts to substitute proof of Plaintiff's knowledge with that of others fails. *See e.g. Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 492, (D.S.C. 2000) (noting that "[T]he 'common knowledge' requirement is emasculated if a defendant may show merely that the public was aware that a product presented ... risks at some vague, unspecified, and undifferentiated level.")

Despite Defendants' efforts to elide the distinction between Mr. Priester and his coworkers, there are genuine issues of material fact as to whether Mr. Priester was aware of the risks, and the consequences thereof, posed by the failure of Slider No. 2 to fully extend prior to the Incident. First, Mr. Kirkland, Mr. Priester's supervisor, noted that Mr. Priester regularly followed orders and instructions and was never observed doing anything unsafe. *See* Ex. 17 at 86:20-87:2. Likewise, Mr. Bunch testified "You wouldn't think so," when asked if the failure of Slider No. 2

to fully extend created a gap large enough for someone to fall through.  *See* Ex. 19, Bunch Dep., at 86:17-20.

Similarly, Mr. Bunch did not recall any specific statements made Mr. Priester before the Incident which identified the gap created by Slider No. 2 as a fall hazard; indeed, he did not recall any by Mr. Priester about the gap at all. *Id.* at 121:16-22. Likewise, Mr. Pullam has testified that he has no recollection of ever discussing how, or if, the gap created by Slider No. 2 posed a risk of a 'fall hazard' with Mr. Priester, nor did he recall any conversation amongst he and his co-workers about the need to not work in the vicinity of Slider No. 2 because of a fall risk. *See* Ex. 16 at 156:13-21. This testimony is clear indicia not only that the Plaintiff's decedent was not aware of the risk posed by the failure of Slider No. 2 to fully extend, but also that that risk, and its consequences, were not so unequivocally clear as to obviate a duty to warn.

Likewise, Mr. Battle has testified that that he was never told not to go out when a slider was not fully extended, nor was he aware of anyone telling that to Mr. Priester prior to the Incident. *See* Ex. 18 at 35:22-36:22.  In addition, Mr. Kirkland never had any "individual[] one on one" conversations with Mr. Priester where he told him to not venture onto the sliders unless all 18 were extended, nor are there any documents which can substantiate if or when any such conversation was given to Mr. Priester as a member of a larger group. *See* Ex. 17 at 74:19-75:20.  Here, a genuine issue of material fact exists as to whether the risks, and the consequences of the risks, posed by the failure of Slider No. 2 to fully extend were either known to the Plaintiff and/or were open and obvious. As a result, the question of whether the Defendants had a duty to warn Mr. Priester is properly reserved for the jury.

**B.  Plaintiff's Decedent's Putative Awareness of the Danger Posed by Cell 90, And The Reasonableness of His Actions, Is A Jury Question.**

Defendants also assert that Plaintiff's strict liability claims are barred under S.C. Code Ann. § 15-73-20. Here, while the Defendants' brief is replete with references to the putative knowledge of, and actions and inactions by "the crew,"[7] the relevant inquiry under Section 15-73-20 focuses on Mr. Priester. The materials cited by the Defendants do not establish, as a matter of law, that *Mr. Priester* discovered the defects in Cell 90, that *he* was aware of the dangers posed by those defects, or that *his* use of Cell 90 was unreasonable. As with their other arguments, Defendants' arguments here pose questions of fact that are properly resolved by a jury. *See e.g. Fleming,* 450 S.E.2d at 594 (noting that the question of "Whether Fleming's continued use of the product after discovering

---

[7] Throughout their memorandum, the Defendants' make representations about various actions and inactions of Mr. Priester's coworkers, with the obvious, if unstated, goal of blurring the line between the actions and knowledge of Mr. Priester and those of his fellow workers. Of note, all of Mr. Priester's coworkers were Boeing employees. Boeing, by virtue of the Worker's Compensation Act, is not "liable at common law, or otherwise." *See* S.C. Code § 42-1-540. Likewise, "[t]he immunity is conferred not only on the direct employer, but also on co-employees. Under South Carolina Code Ann. section 42-5-10 (1985), a co-employee who negligently injures another employee while in the scope of employment is immune under the Workers' Compensation Act and cannot be held personally liable." *See Strickland v. Galloway*, 348 S.C. 644, 646–47, 560 S.E.2d 448, 449 (Ct. App. 2002) (*citing Dickert v. Metropolitan Life Ins. Co*., 311 S.C. 218, 222, 428 S.E.2d 700, 702 (1993). Here, Boeing and Plaintiff's co-workers are not simply immune from suit pursuant to § 42-1-480; rather, "pursuant to the Workers' Compensation laws, [they] could not be liable to [Plaintiff] in tort," as a "third-party defendant and [a Plaintiff's employer and coworkers] are not joint torfeasors." *See Gordon v. Phillips Utils., Inc*., 406-407, 608 S.E.2d at 427-428 (S.C. 2005). As such, while S.C. Code Ann. § 15-38-15(D) notes that defendants "retain the right to assert that another potential tortfeasor, whether or not a party, contributed to the alleged injury or damages and/or may be liable for any or all of the damages alleged by any other party," here, under *Gordon*, neither Boeing nor Plaintiff's coworkers are, as a matter of law, 'potential' or actual "torfeasors" with respect to the Plaintiff. *See Gordon*, 608 S.E.2d at 427-428. While Defendants' efforts to attribute the actions and knowledge of "the crew" to Mr. Priester are in and of themselves unpersuasive, as a matter of law those references cannot be used to negate a showing that their actions were proximate causes of Plaintiff's injuries under S.C. Code. Ann. § 15-38-15(D).

the defect was reasonable was a jury question.") As such, granting summary judgment would be inappropriate.

First, under South Carolina law, the mere fact that a plaintiff may be aware of a general danger does not mean that he realizes the existence of a specific risk. This rationale has been codified in the text of S.C. Code Ann. § 15-73-20, which sets forth three separate conditions that must be satisfied to bar a Plaintiff's claim. *See* S.C. Code Ann. § 15-73-2 (noting that (1) "[i]f the user or *consumer discovers the defect*," and the user or consumer (2) "*is aware of the danger*," and he (3) "nevertheless *proceeds unreasonably to make use of the product* and is injured by it," *then* "he is barred from recovery." (emphasis added).[8] Indeed by its very terms, S.C. Code Ann. § 15-73-20 specifies that even where a plaintiff is unquestionably aware of a danger, that awareness of danger does not bar recovery unless the plaintiff *unreasonably* uses a product.[9]

---

[8] To the extent that Defendants' are positing that the sign discussed by Mr. Motz (Exs. A and C to Defs.' Mem., discuss *supra*) entitles them to summary judgment under S.C. Code Ann. § 15-73-20, they are mistaken. As recently noted by Judge Harwell, "Comment j [to the Section 402A of *Restatement (Second) of Torts* ] and the South Carolina cases interpreting it simply recognize an adequate warning *may* preclude liability for a defective design claim." *Marshall v. Lowe's Home Centers, LLC*, No. 4:14-CV-04585-RBH, 2016 WL 4208090, at *20 (D.S.C. Aug. 10, 2016) (emphasis in original) (attached hereto as Ex. 23). Indeed, where Defendants assert "an adequate warning defense to Plaintiff's design defect claim," those Defendants "must carry the burden to show the warnings were adequate." *Id.* Questions on the adequacy of the warning provided, and, therefore, its putative impact on whether it (1) alerted Mr. Priester to the defect, (2) identified the danger posed by the defect or (3) made Mr. Priester's subsequent actions unreasonable, remain issues "of fact for the jury…." *Id.* (citing *Curcio,* 585 S.E.2d at 274). Indeed, the Fourth Circuit has recently "emphasized a jury question can still arise regarding whether a product was defectively designed, even in the face of allegedly adequate warnings." *Id.* (citing *Eskridge v. Pac. Cycle, Inc.*, 556 Fed.Appx. 182, 188-89 (4th Cir. 2014) (quoting David G. Owen, *Warnings Don't Trump Design: The Rise and Fall of § 402A Comment j*, 153 Prod. Liab. Advisory 1 (Nov. 2001)).
[9] *See also Cole v. S. Carolina Elec. & Gas, Inc.,* 362 S.C. 445, 453–54, 608 S.E.2d 859, 863–64 (2005) (noting that to establish a defense of assumption of risk that "1) the plaintiff must have knowledge of the facts constituting a dangerous condition; (2) the plaintiff must know the condition is dangerous; (3) the plaintiff must appreciate the nature and extent of the danger; and (4) the plaintiff must voluntarily expose himself to the danger.")

South Carolina cases have long recognized that the factors set forth in Section 15-73-20 are proper inquiries for a jury. For example, in *Koester v. Carolina Rental Center, Inc.,* 313 S.C. 490, 443 S.E.2d 392 (1994), a case in which a worker fell because a rope gave way while he was using tree climbing equipment, the court emphasized that reasonableness is a jury question even though the worker obviously was aware that he could fall while climbing a tree:

> The plain language of section 15-73-20 requires a defendant in a product liability action to prove, among other things, that the plaintiff proceeded unreasonably to make use of the product. Here, Koester attempted to use the product in the manner intended by the supplier. Under these circumstances, whether the use of the product was unreasonable is a question of fact for the jury.

*See Koester*, 443 S.E.2d at 394-95.

Similarly, even when an employee has been warned of a particular danger, a jury must ordinarily decide whether proceeding in the face of that danger constitutes an unreasonable use of the product. In *Scott v. Fruehauf Corp.,* 302 S.C. 364, 396 S.E.2d 354 (1990), an employee was injured when a defective wheel assembly exploded while he was attempting to place the assembly on a trailer. Addressing the issues of the employee's putative contributory negligence and assumption of risk, the court stated:

> Fruehauf further contends the trial judge should have found Scott contributorily negligent or assumed the risk as a matter of law based on evidence Scott's employer warned him to put the tires in a cage before inflating them to avoid the danger of exploding rims. The issues of contributory negligence and assumption of the risk were questions of fact for the jury.

*See Scott* 396 S.E.2d at 357.

Similarly, courts in other jurisdictions have also recognized that questions regarding a plaintiff's fault in using a product are reserved for the jury. In *Wallner v. Kitchens of Sara Lee, Inc.,* 419 F.2d 1028 (7th Cir. 1970), a maintenance company's repairman inspected a malfunctioning conveyor without shutting it off. He slipped on an oily floor and began to fall. As

he attempted to break his fall, his hand was caught in the conveyor, which had no protective guard at that point. On the issue of contributory negligence, the court stated:

> Both Sara Lee and Thiele argue that Wallner was guilty of contributory negligence as a matter of law because of his failure to shut off the conveyor before he began his inspection. Contributory negligence is ordinarily a matter to be decided by the jury. In the instant case we believe the jury could reasonably find that Wallner was not guilty of contributory negligence. The jury was properly instructed on the requirement that the plaintiff prove his freedom from contributory negligence and the district court did not err in refusing to direct a verdict for the defendants.

*Id.* at 1033 (internal citations omitted).

Moreover, in *Merced v. Auto Pak Co.,* 533 F.2d 71 (2d Cir. 1976), a trash compactor (called the "Gobbler") was situated at the bottom of a chute. Trash would fall down the shoot, slide down a deflection plate and then come to rest on a ram that would compact it. Trash routinely became clogged, and a worker was assigned to unclog it. The plaintiff reached into the hopper area while the ram was in operation, attempting to remove a piece of wood and to break up clogged trash with a stick. As he did so, a bottle fell down the chute and struck his head. More trash came down and pushed his hand in front of the ram, and the ram severed the hand from his arm.

Addressing the issue of the reasonableness of the plaintiff's conduct, the court noted that a user of the trash compactor may realize the risk of being struck by bouncing objects, but may not "perceive the particular danger of having at the same time both his hand above the ram and his head near enough to be struck by a flying object bouncing off the deflection plate." *Id.* at 79. Ruling that the issue of the reasonableness of the plaintiff's use of the product was for the jury, the court explained, "The question of normal manner of use is determined by consideration of whether or not the dangerous handling of the product should reasonably have been foreseen by the manufacturer." *Id.* at 79-80.

Here, Defendants have asserted, *inter alia*, that the actions of "Plaintiff and his coworkers" were "in clear violation of their training, Boeing procedures and protocol, and OSHA."[10] *See* Defs.' Mem. at 19. However, Defendants' conclusory statements are contradicted by the facts and do not provide a basis for granting summary judgment. For example, Mr. Pullam noted that when encountering problems with Cell 90, workers would attempt to troubleshoot issues with sliders without entering a Maximo "[p]robably 75 percent of the time," showing that it was standard for workers to continue using Cell 90 even after they arguably encountered the failure of all sliders to deploy. *See* Ex. 16 at 167:13-25. Similarly, Mr. Bunch testified that was not unusual for employees to continue working when one of the sliders was not fully extended. *See* Ex. 19, Bunch. Dep., at 104:20-106:1. Indeed, noted by Mr. Eckhardt, the use of Cell 90 when fewer than all of the sliders were extended "was permitted," as "there was nothing to prevent it." *See* Ex. 24, Eckhardt Dep. at 39:4-10.

In addition, Mr. Bunch did not recall any discussions or statements by Mr. Priester about the gap created by Slider No. 2 or any risks its posed. *See* Ex. 19 at 121:16-22. Similarly, Mr.

---

[10] Defendants' contention that Plaintiff and his co-workers violated OSHA is particularly problematic. This contention derives solely from a paragraph in Mr. Durig's report. *See* Defs.' Mem. at 12 (citing Exhibit L thereto at 8). However, as noted above, SC OSHA investigated the Incident and specifically "found no violations of the South Carolina Rules and Regulations existed…." *See* Ex. 20. Hence, Defendants' assertions on OSHA violations are predicated solely on Mr. Durig's *ipse dixit* and are contradicted by the findings of the very entity tasked with enforcing such regulations. Moreover, the Fourth Circuit has held that "OSHA regulations are not relevant to the liability of a manufacturer to an employee of an industrial consumer.*" Davis v. Hebden, Schilbe & Smith, Inc*., 52 F.3d 320 (4th Cir. 1995) (citing *Minichello v. U.S. Indus., Inc*., 756 F.2d 26, 29 (6th Cir.1985)). It is axiomatic that "[o]nly admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1994)). Here, evidence that Plaintiff, his colleagues, or some of them, violated OSHA is irrelevant, far more prejudicial than probative, and given that such assertions are flatly contradicted by the relevant governmental authority's own investigation, patently unreliable as a basis for expert testimony, and as such it is inadmissible *See e.g.* Fed. R. Evid. 402; 403; 702.

Pullam did not recall any discussions on whether Cell 90's Slider No.2 Gap created a risk of a fall hazard, or any conversations amongst his colleagues about a need to avoid working in the vicinity of Slider No. 2 due to such a risk. *See* Ex. 16 at 156:13-21. Moreover, Mr. Battle, another Boeing employee, has testified prior to the incident, he was never told, nor did he ever witness anyone tell Mr. Priester not to go out onto Cell 90 unless all of the sliders were extended. See Ex. 18, Battle Dep. 35:22-36:222.

As noted by Mr. Eckhardt, in such situations it is common that users do not "appreciate that if they were to fall through the hole, that they would fall from that height." *See* Ex. 24 at 70:16-23. That Mr. Priester and his colleagues continued working shows that they "functioned within their knowledge," and "with the level of knowledge and understanding that they had, it's completely foreseeable;" indeed, the actions of both Mr. Priester and of his colleagues were "not unreasonable under the circumstances." *Id.* at 124:21-126:7. Indeed, "[o]ften workers will attempt to work around an unguarded floor opening believing that they will remember that it is there, only to forget, and/or trip consequently falling, as they go about their work." *See* Ex. 2 at 10.  If an accident occurs in such situations, it is for the jury to determine whether Section 15-73-20 bars a Plaintiff's claims based upon specific evidence regarding the Plaintiff's own knowledge and actions. As such, Defendants' motions should be denied.

C. **The Foreseeability to Futuramic and Capital of SAR's Work on Cell 90 Poses a Genuine Issue of Material Fact.**

Defendants next argue that Plaintiff's claims are barred on the basis that "Cell 90 was modified by SAR after it left Futuramic's hands and … such modifications proximately caused Plaintiff's injuries…." *See* Defs.' Mem. at 19. As detailed below, Defendants' arguments are thoroughly unpersuasive.

1. *The Work Done By SAR Was Foreseeable to the Defendants.*

Here, the facts show that Futuramic and Capital delivered an incomplete designed and manufactured product.  Consequently, it strains credulity for the Defendants to assert that it was unforeseeable that another entity would complete some of the very tasks they failed to ensure were finalized. For example *prior* to the placement of Cell 90 into the stream of commerce or its acceptance by Boeing at the North Charleston facility, Boeing issued an SOW for the addition of a redundant brake system for Cell 90 which was ultimately installed by SAR. *See* Ex. 6 at 87:25-89:16; *see also* Ex. 7. Boeing "provided [Futuramic] a request for quote" on this additional work. *See* Ex. 6 at 89:17-20. *See also See* Ex. 4 at 179:23-180:7 (where Mr. Motz of Boeing noted "I know we talked at Futuramic about the upcoming addition of redundant brakes and the fact that we did put Futuramic on contract to … provide their side of the interface on that."). However, because Futuramic indicated that performing that work would alter the "production rate schedule" for Cell 90, Ex. 10 at 89:19-90:8, SAR was retained to install redundant brake system. *See* Ex. 6 at 90: 90-21.

While Defendants' brief posits that SAR's actions were unforeseeable, in point of fact Futuramic gave SAR "access into their system," meaning that they provided interface, information and cooperation for another entity to perform the installation of the redundant brake controls. *See* Ex. 6 at 89:25-90:20. In doing so, "Futuramic/Capital Welding knew of, and facilitated, the transfer of the as-delivered, incomplete logic software to SAR so that modification and commissioning of Cell 90 could go forward." *See* Ex. 5, ¶ 24; *see also* Exs. 13 and 14, *passim.* Futuramic was also aware that SAR was present onsite at the Boeing facility when Mr. Smallwood (temporarily) and Mr. Martin were also present at Boeing representing the Defendants' interests, after the product was delivered. *See* Ex. 12 at 128:2-7.

Moreover, "[a]t the time Cell 90 was delivered to Boeing, the design and manufacture of

the product was incomplete as it lacked finished control logic and slider sensors that actually detected the barrel." *See* Ex. 4, ¶ 36. To wit, "[a]s delivered to Boeing, Cell 90's the logic controls Cell 90 were an incomplete, contained NOPs, and was in a condition which would neither activate an alarm nor prevent the motion of the sliders, contrary to the design intent and Boeing's specifications." *Id.*, ¶ 44. Indeed, "turning over the platform with unfinished controls made it eminently foreseeable to Futuramic and Capital Welding that edits to the control logic could and would be made," and that "modifications to the slider sensors could and would be made." *Id.* ¶¶ 50-51.

Furthermore, Cell 90 was not put into production use until after both the delivery and assembly by Capital, as well as SAR's operations, had been completed. *See* Ex. 10 at 93:17-25. After the completion of the commissioning, on December 4, 2012, Boeing contacted Futuramic, noting that an "Urgent Correction [was] Needed" as "[t]he sliders are not stopping and drive into composite material and the metallic barrel cart ending. Need help immediately to troubleshoot and resolve this issue on site Boeing South Carolina." *See* Ex. 11. Despite this request for urgent assistance from Boeing in December 2012, Futuramic did not resolve that issue before the Incident in March 2013. *See* Ex. 12 at 128:16-23.

Under South Carolina law, "in a products liability case, liability may be imposed upon a manufacturer or seller notwithstanding subsequent alteration of the product when the alteration *could have been anticipated* by the manufacturer or seller." *Small,* 494 S.E.2d at 844 (emphasis added). In *Small*, the court noted that "liability may be imposed upon a manufacturer or seller notwithstanding subsequent alteration of the product when the alteration could have been anticipated by the manufacturer or seller." *Id.* at 844. In that case, a wood skidder was being used without a side door or operable brakes and too close to the plaintiff, who was injured when a tree

limb fell on him after the skidder was used to push a tree so as to release a stuck chain saw. The court ruled that misuse of the skidder was foreseeable, stating:

> Pioneer and Timberjack aver the skidder was being misused at the time of the accident in violation of written safety warnings because it was being operated without the driver's side door, without operable brakes, and too close to the vicinity of persons, i.e., Small. Yet, the jury concluded the alterations did not causally contribute to the accident. *Further, use of the skidder to help remove a chain saw stuck in a tree is common practice in the logging industry....* Accordingly, these arguments presented jury issues.

*Id.* (Emphasis added)

Similarly, in the *Fleming* case, an employer removed the defendant manufacturer's platform and substituted a ladder to be used for access while cleaning the manufacturer's machines. *Fleming*, 454 S.E.2d at 593. This substitution was made because the machines were installed so close to each other that the top of the machines could not be reached with the platforms. *Id.* Ruling that the manufacturer could have foreseen this substitution, the court stated:

> The trial judge found that since it was undisputed that the machine was materially altered after delivery to Borden, he was required to grant summary judgment in favor of Woodman. This was error. While all parties agreed that the machine had been altered by removal of the Woodman platform, the parties vigorously dispute the foreseeability of this action and the relationship of the removal of the platform to the accident. "Liability [may] ... be imposed upon a manufacturer or seller notwithstanding subsequent alteration of the product ... [when] the alteration could have been anticipated by the manufacturer or seller, or did not causally contribute to the damages or injuries complained of." .... Woodman not only manufactured the machine and the platform but also installed the machine.... [I]t was for the jury to decide whether the removal of the Woodman platform was a foreseeable alteration of the machine since there was evidence that Woodman installed the machine in such a manner as to prevent the use of the platform it supplied with the machine. If the jury believed this evidence, it could legitimately conclude that removal of allegedly misdesigned platform was an alteration, but not a substantial or material one, inasmuch as it was foreseeable. If the jury so concludes, the defense of "material alteration" fails.

*Fleming*, 450 S.E.2d at 593 (internal citations omitted).

Likewise, in *Kennedy,* the plaintiff was injured when he attempted to loosen ice that had

clogged an overhead conveyor, using a hoe. *See Kennedy*, 246 S.E.2d at 176. The plaintiff's employer had built a catwalk along the conveyor to allow for such cleaning. There was evidence that the buildup of ice was a common problem and that the conveyor manufacturer "was aware of the need to come in close contact with the conveyor to dislodge the bridged ice." *Id.* at 178. There was also evidence of actual knowledge "that it was a common practice in other ice plants to reach into the ice storage bins with a garden hoe to dislodge the frozen ice." *Id.* The court ruled that a jury question existed as to whether it was foreseeable that a catwalk would be used to provide access for removing frozen ice from the conveyor:

> Appellant next contends it was entitled to a directed verdict as to respondent's second cause of action for strict liability in tort. Appellant alleged the screw conveyor was not defective when installed because of the insulation provided by height and argued Georgetown modified the conveyor when it constructed the catwalk and thereby created the defect. Respondent admitted the catwalk was constructed by Georgetown, but offered evidence that appellant had actual knowledge of the construction and use of similar catwalks in other ice plants and should have foreseen the use of a catwalk by Georgetown. Respondent argued the failure to anticipate the foreseeable use of a catwalk by placing protective shields on the conveyor rendered the design of the conveyor defective. The test of whether a product is defective when sold is whether the product is unreasonably dangerous to the consumer or user given the conditions and circumstances that will foreseeably attend the use of the product. Under this test, the jury could have determined that the construction of the catwalk by Georgetown was a foreseeable circumstance that required the incorporation of protective shields in the design of the conveyor.

*Kennedy*, 246 S.E.2d at 178 (internal citations omitted).

Cases from outside South Carolina also recognize this principle. In *Tuttle v. Sudenga Indus.,* 868 P.2d 473 (Idaho 1994), a manufacturer provided guards that snapped into place on a grain auger. However, when the guards were securely tightened grain would clog the auger. An employer altered the guards so that they rested loosely on top of the auger rather than snapping into place. An employee then removed the guards and was injured when his foot slipped into the auger. The court ruled that a jury question existed as to the foreseeability of the alteration to the

auger, stating:

> Because we rule that under the Idaho Products Liability Act, the alteration of a product does not necessarily serve as a complete bar to strict liability or a determination of negligence by the product manufacturer, we conclude that the summary judgment granted by the district court for defendant Sudenga Industries was inappropriately granted in this case. We also conclude that genuine issues of fact remain as to the defectiveness of the warnings and the auger covers and as to whether the alteration of the covers, as compared to the design of the covers as produced by Sudenga, proximately caused Tuttle's injuries.

*Id.* at 479.

As these cases illustrate, courts have often ruled that post-sale alterations of machines do not cut off a manufacturer's potential liability. Here, the question of whether the work done by SAR was foreseeable to Futuramic and Capital is one for the jury.

### 2. *Defendants Misconstrue The Relevant Causation Standards & Mr. Ebersole's Findings*

Defendants also assert that Plaintiff's expert, Mr. Ebersole, has opined that "*the* proximate cause of Plaintiff's accident are the alterations to Cell 90 made by Defendant SAR…." *See* Defs.' Mem. at 24. Based on this inventive interpretation of Mr. Ebersole's findings, Defendants thus argue that they are exculpated from liability. *Id.* Defendants' assertions on this point are specious as they not only ignore applicable case law but also willfully misstate Mr. Ebersole's findings.

First, Defendants' arguments fundamentally misconstrue Mr. Ebersole's expert analysis. In response, Mr. Ebersole has offered the attached affidavit, in which he notes, *inter* alia, that:

> Futuramic/Capital Welding also cite findings from my Rule 26 Report about the impact of SAR's programming, including that:
>
> a. SAR Automation failed to complete communication loss detection and this was a cause of Mr. Priester's fatality;
> b. SAR Automation introduced program changes for manual control and these changes were a cause of Mr. Priester's fatality; and
> c. SAR Automation defeated the sensors for fuselage detection and left them defeated from early December, 2012 to the time of Mr. Priester's fatality on March 18, 2013 and this was a cause of Mr. Priester's fatality.

*See* Ex. 5, ¶ 25.

Mr. Ebersole has specified that, "[a]s I noted in my report, each of the above-referenced findings regarding SAR indicates that SAR's activities were 'a cause of Mr. Priester's fatality.'" *Id., ¶* 26. Mr. Ebersole's affidavit notes that has *not* "'opined that *the* proximate cause of Plaintiff's accident is the alterations to Cell 90 made by Defendant SAR.'" *Id.* Rather, Mr. Ebersole has noted that "[w]hile SAR's actions were a contributing cause to Mr. Priester's fatality, based on my review of the information in the file and education, training and experience, the actions and inactions of Futuramic/Capital Welding were also a contributing cause to the fatality." *Id.* Specifically, "Futuramic/Capital Welding enabled SAR's foreseeable actions by (A) delivering an incompletely designed and manufactured produced (B) allowing the native logic software to be supplied to SAR without conditions or oversight necessary to ensure proper commission and completion of Cell 90 to is design intent." *Id.*

Furthermore, Mr. Ebersole has noted that "Futuramic/Capital Welding delivered an incomplete product to Boeing as a result of the failure to finalize and incorporate logic for detecting communication failure that would result in motion failure of a slider, as Cell 90 deviated from its intended design and function due to the lack of software for detecting communication failure that would result in motion failure of a slider." *Id.*, ¶27. Moreover, "These failures by Futuramic/Capital Welding to effectively meet these industry standards resulted in the delivery of a system with incomplete software and were a cause of Mr. Priester's fatality." *Id.*, ¶ 28.

Furthermore, Defendants' arguments ignore the applicable South Carolina case law on proximate cause. Under South Carolina law, a plaintiff suing under a products liability cause of action can recover all damages that were proximately caused by the defendant's role in placing an

unreasonably dangerous product into the stream of commerce. *See e.g. Small,* 494 S.E.2d at 843; *Parr v. Gaines,* 424 S.E.2d at 515. Proximate cause requires proof of causation in fact and legal cause. *Bray,* 588 S.E.2d at 95; *Trivelas v. South Carolina Dep't of Transp.,* 558 S.E.2d 271 (Ct. App. 2001). Causation in fact is proved by establishing the injury would not have occurred "but for" the defendant's negligence. *Small,* 494 S.E.2d at 842. Legal cause is proved by establishing foreseeability. *Bray,* 588 S.E.2d at 95; *Small,* 494 S.E.2d at 842. The touchstone of proximate cause in South Carolina is foreseeability. *Koester,* 443 S.E.2d at 392; *Small,* 494 S.E.2d at 842. The test of foreseeability is whether some injury to another is a natural and probable consequence of the complained-of act. *Id.* For an act to be a proximate cause of the injury, the injury must be a foreseeable consequence of the act. *Small,* 494 S.E.2d at 842-43.

Although foreseeability of some injury from an act or omission is a prerequisite to establishing proximate cause, the plaintiff need not prove that the actor should have contemplated the particular event which occurred. *Whitlaw v. Kroger Co.,* 306 S.C. 51, 410 S.E.2d 251 (1991); *Sims v. Hall,* 357 S.C. 288, 592 S.E.2d 315 (Ct. App. 2003). Proximate cause is the efficient or direct cause of an injury. *Small,* 329 S.C. at 464, 494 S.E.2d at 843. Proximate cause does not mean the sole cause. *Bishop v. South Carolina Dep't of Mental Health,* 331 S.C. 79, 502 S.E.2d 78 (1998); *Small,* 494 S.E.2d at 843. The defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury. *Sims,* 357 S.C. at 299, 592 S.E.2d at 320; *Small,* 494 S.E.2d at 843. Here, Plaintiff has made a sufficient showing Futuramic and Capital each was *a* proximate cause of Mr. Priester's injuries and death. Consequently, the Defendants' motion should be denied.

### D.  Capital Owed A Duty of Reasonable Care To Plaintiff

Finally, while Futuramic has only moved for summary judgment on Plaintiff's strict liability claims, Defendant Capital has moved for summary judgment as to Plaintiff's negligence

counts as well, asserting that it did not breach any duty of care owed to the Mr. Priester. *See* Defs.'
Mem. at 2-3. Plaintiff submits that a genuine issue of material fact exists as to whether Capital
breached duties owed to the Plaintiff, which forecloses summary judgment.

In South Carolina, a manufacturer has the duty to use reasonable care throughout the
manufacturing process, including making sure the product is free of any potentially dangerous
defect in manufacturing or design. *Brooks v. GAF Mat. Corp.*, 41 F. Supp. 3d 474 (D.S.C. 2014).
Here, a genuine issue of material fact exist as to whether Capital[11] negligently breached that duty
of due care. As noted by Mr. Worthington, his role in the design, manufacture and assembly of
Cell 90 included, *inter alia*, "… assisting in any way I can with the design activities or
manufacturing" assisting "in structural engineering," as well as suggesting "possible solutions to
any issues that might be related to the design." *See* Ex. 8 at 38:24-25; 40:25-41:7. Likewise, as
noted by Mr. Eckhardt, "Capital Welding is a subsidiary of Futuramic and was the 'manufacturer',
or 'Supplier' and its intended role in the design, manufacture, realization and commissioning of the
product was to provide 'equipment' or 'services.'" *See* Ex. 4, ¶ 8. In addition, pursuant to the SOW,
Futuramic and Capital were obliged to "provide complete instructions for testing, operating, and
maintaining the equipment including, warnings and cautions of hazards to people, parts, and
equipment." *See* Ex. 3, ¶ 4.1.1; *see also* Ex. 6 at 80:9-25. Furthermore, the installation plan for
Cell 90 specifically acknowledged that Capital was to, *inter alia*, "Train Boeing employees on

---

[11] Plaintiff also notes that South Carolina has three ways to hold a parent company liable in place
of a subsidiary, including piercing the corporate veil; alter-ego or instrumentality theory; and the
amalgamation of interests or blurred identity theory. *Magnolia North Prop. Owners' Ass'n v.
Heritage Cmtys., Inc.*, 397 S.C. 348, 358-59 (Ct. App. 2012). Plaintiff submits that the duties owed
by Futuramic, which have not been contested, are also attributable to Capital as the joint activities
of Capital and Futuramic satisfy the agency test because they are "an amalgamation of corporate
interests, entities, and activities so as to blur the legal distinction between the corporations and
their activities." *Kincaid v. Landing Dev. Corp.*, 344 S.E.2d 869, 874 (Ct. App. 1986).

operation and charging." *See* Ex. 25, Futuramic000750. Likewise, the Bill of Lading for Cell 90 denotes that the "Shipper" was "Capital Welding/Futuramic." *See* Ex. 26, Capital 000128. Cognizable legal duties exist and as detailed herein, Capital's breach of those duties was a proximate cause of Mr. Priester's death.

## V.     CONCLUSION

Defendant Futuramic's motion for *partial* summary judgment on Plaintiff's strict liability claims should rejected as (1) there is a genuine issue of material fact as to the existence of design, manufacturing and warnings defects within Cell 90 when delivered to Boeing; (2) whether the Plaintiff's putative knowledge of the gap arising from Slider No. 2's failure to deploy, and the risks associated therewith, are sufficient to bar recovery are questions for the jury; and (3) any changes made to Cell 90 after its delivery were both foreseeable to Futuramic and to Capital. Likewise, Capital's motion arguments in favor of *complete* summary judgment should be rejected because, in addition to the foregoing reasons identifying the insufficiency of Futuramic's position, Capital owed the Plaintiff's decedent a duty of reasonable care.

Respectfully submitted, this the 18th day of August, 2016,

**MOTLEY RICE LLC**

By:       s/ Kevin R. Dean          
Kevin R. Dean
*Federal Bar No.: 8046*
Anne McGinness Kearse
*Federal Bar No.: 7570*
W. Christopher Swett
*Federal Bar No.: 11177*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
(843) 216-9000 |(843) 216-9440 (Facsimile)
kdean@motleyrice.com
akearse@motleyrice.com
wswett@motleyrice.com