IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Lisa J. Priester, Individually, and as Personal Representative of the Estate of David A. Priester, Jr., <br><br> Plaintiff, <br><br> vs. <br><br> Futuramic Tool & Engineering Company; Capital Welding, Inc.; Intec Automated Controls, Inc.; and SAR Automation, L.P., <br><br> Defendants. | C/A No. 2:14-cv-01108-DCN <br><br><br><br><br> **Plaintiff's Memorandum in Opposition To Defendants Futuramic Tool & Engineering Company and Capital Welding's Motion to Strike or Exclude the Affidavits of Bartley J. Eckhardt, P.E. and Daryl L. Ebersole, P.E.** |

Plaintiff, Lisa J. Priester ("Mrs. Priester"), Individually, and as Personal Representative of the Estate of David A. Priester, Jr. ("Mr. Priester"), by and through the undersigned counsel, respectfully submits this Memorandum in Opposition to the Motion to Strike or Exclude the Affidavits of Bartley J. Eckhardt, P.E. and Daryl L. Ebersole, P.E., jointly submitted by Defendants Futuramic Tool and Engineering Company ("Futuramic") and Capital Welding, Inc. ("Capital") (hereinafter collectively referred to as "Defendants").[1]

## I.    Background

Plaintiff timely designated Bartley J. Eckhardt, P.E. ("Mr. Eckhardt") and Daryl L. Ebersole, P.E. ("Mr. Ebersole") as Rule 26 expert witnesses on December 22, 2015.[2] Mr. Eckhardt's deposition was held on February 3, 2016; Mr. Ebersole was deposed on February 19, 2016.[3]

---

[1] *See* Defs.' Mot. and Mem., Dkt. Nos. 87 and 87-1.
[2] *See* Pl.'s Rule 26(a)(2) Disclosure, Dkt. No. 66. *See also* Mr. Eckhardt's Rule 26 Report, Ex.1 *and see* Mr. Ebersole's Rule 26. Report Ex. 2.
[3] *See* Ex. 3, Eckhardt Dep., *passim*; *see also* Ex. 4, Ebersole Dep., *passim*.

Subsequently, on July 1, 2016, Defendants each submitted motions for summary judgment and identical supporting memoranda.[4]  In their briefing, Defendants made numerous references to findings by Mr. Eckhardt and Mr. Ebersole, alleging that Plaintiff's experts' own opinions helped to establish the absence of genuine issues of material fact as to the liability of Capital and Futuramic. With respect to Mr. Eckhardt, Defendants erroneously asserted that his testimony and report supported their contentions that (1) Plaintiff could not establish the existence of a manufacturing defect[5] in Cell 90;[6] and (2) that Plaintiff's sole basis for alleging a design a defect in Cell 90 was the absence of optional safety features, including an interlocking gate and elevated wall along the edge of Cell 90 leading to the sliders.[7]

Similarly, Defendants cited to Mr. Ebersole's deposition testimony to support their assertion that no manufacturing defect existed in Cell 90.[8] Defendants also made repeated references to Mr. Ebersole's Rule 26 report, asserting that his findings supported their contention that putative post-sale modifications to Cell 90, made by Defendant SAR Automation, L.P. ("SAR"), were *the* sole proximate cause of Mr. Priester's injuries and death, exculpating the Defendants from any liability.[9]

---

[4] *See* Futuramic's Mot. Summ. J. and Mem, Dkt. Nos. 75 and 75-1, and Capital's Mot. Summ. J. and Mem., Dkt. Nos. 76 and 76-1.  The motions and memoranda filed under docket numbers 75 and 76 were identical; in both Futuramic sought partial summary judgment on Plaintiff's strict liability claims and Capital sought complete summary judgment. *Id.*

[5] *See* Pl.'s Opp. Summ. J., at 14-16, Dkt. No. 82 (discussing manufacturing defect law in South Carolina).

[6] *See* Futuramic's Mot. Summ. J. and Mem, Dkt. Nos. 75 and 75-1, and Capital's Mot. Summ. J. and Mem., Dkt. Nos. 76 and 76-1, at 11-12 (*citing* Eckhardt Dep. 90:4-7) (full transcript attached hereto as Ex. 3).

[7] *Id.* at 13 (*citing* Eckhardt Rep. at 26) (Eckhardt Rep. attached hereto as Ex. 1).

[8] *Id.* at 12 (*citing* Ebersole Dep. at 72:17-23) (full transcript attached hereto as Ex. 4).

[9] *Id.* at 4-5; 22 (*citing* Ebersole Rep. at 4; 26; 35) (Ebersole Rep. attached hereto as Ex. 2).

Consistent with this Court's ruling, Plaintiff submitted her memorandum in opposition to the Defendants' summary judgment motions, with exhibits, on August 18, 2016.[10] As part of her response to the Defendants' summary judgment motions, the Plaintiff submitted the affidavits of Mr. Eckhardt and Mr. Ebersole.[11] In the process of preparing their affidavits, Mr. Eckhardt and Mr. Ebersole each attempted to address the instances in Defendants' summary judgment memoranda where their respective testimony and opinions had been misconstrued.

For example, in his affidavit Mr. Eckhardt noted that "[m]y report describes requirements of ISO 9001:2008 Quality Management Systems- Requirements, to which Futuramic is certified, and which Futuramic failed to adequately fulfill resulted in the incident platform being delivered to *Boeing incomplete and defective in a manner that caused, or contributed to, Priester's fatal injury*."[12] Mr. Eckhardt also reiterated his findings that "Cell 90 was defective in its design and manufacture in part because it was delivered by Futuramic and Capital Welding with unfinished control logic and slider sensors that failed to detect the barrel, such that its design and manufacture were incomplete."[13]

Likewise, Plaintiff's submitted Mr. Ebersole's affidavit in order to clarify a number of instances where the Defendants had cited his testimony and conclusions in a misleading fashion. For example, Defendants asserted that Mr. Ebersole had "opined that the cause of the Slider 2

---

[10] *See* Dkt. Nos. 82 to 82-26.

[11] *See* Eckhardt Aff., Dkt. No. 82-4, attached for reference as Ex. 5; *see also* Ebersole Aff., Dkt. No. 82-5, attached for reference as Ex. 6. *See further* Pl.'s Mem. in Opp. to Defs.' Mot. Summ. J. and Exs., Dkt. Nos. 82 to 82-26.

[12] *Id.*, ¶ 30.

[13] *Compare id.*, ¶ 31 *with* Eckhardt. Rep. at 5 (noting that "My analysis revealed that the incident work platform as designed, manufactured and introduced incompletely into the stream of commerce by Futuramic, and Boeing's subcontractor SAR Automation was unreasonably dangerous, defective and unsuited for its intended purpose in a manner that caused Priester's fatal injury.").

failure was a communication issue related to the programming as modified by SAR, not a manufacturing defect."[14] As such, the Defendants attempted to cast Mr. Ebersole's findings about the source of Slider 2's failure as an implicit admission by Mr. Ebersole had *not* identified any areas where, as delivered, Cell 90 had deviated from its intended design, the hallmark of a manufacturing defect.

Nevertheless, in his affidavit Mr. Ebersole reiterated his finding that the manufacture and design of Cell 90 was incomplete at the time Cell 90 was "supplied by Futuramic/Capital Welding," because it did not conform to its intended design.[15] Specifically, Mr. Ebersole noted that Cell 90 "had software that was incomplete at the time of delivery to Boeing. The software that was delivered lacked logic for detecting communication failure that would result in motion failure of a slider."[16] Mr. Ebersole also identified that Cell 90 deviated from its intended design because, "[a]s delivered to Boeing, and before any work by others, the software lacked communication verification logic and no alarm would occur as a result of the slider drive number 2 not responding."[17] Mr. Ebersole restated his finding that "'NOPs' or 'No Operation' instructions, were used as placeholders during the development of the logic programs for the use on Cell 90. At the time of delivery by Futuramic/Capital Welding, there were at least 40 instances of 'NOPs'

---

[14] *See* Futuramic's Mot. Summ. J. and Mem, Dkt. Nos. 75 and 75-1, and Capital's Mot. Summ. J. and Mem., Dkt. Nos. 76 and 76-1, at 12 (*citing* Ebersole Dep. at 72:17-23) (full transcript attached hereto as Ex. 4).
[15] *See* Ebersole Aff., ¶ 9.
[16] *Id.*
[17] *See* Ebersole Aff., ¶ 14. *See also* Ex. 4, Ebersole Dep., at 35:4-19 (wherein Mr. Ebersole testified that as of November 23, 2012, "the commissioning that was necessary" to have Cell 90 operate as fully intended by Futuramic and Intec was not completed, as "[t]here was software and hardware that was still awaiting completion," specifically the "software for making up a complete control and alarm system that would allow it to meet reasonable standards.")

within the software code.  These NOPs represented incomplete branches in the software which were intended to be completed upon delivery…."[18]

Moreover, Plaintiff offered Mr. Ebersole's affidavit to address the Defendants' repeated assertions that Mr. Ebersole had opined that SAR's actions or omissions were *the* sole proximate cause of Mr. Priester's injuries and death and that SAR's actions were unforeseeable to the Defendants.[19] Consistent with his Rule 26 report,[20] Mr. Ebersole clarified his findings on SAR's role in his affidavit, noting, *inter alia,* that:

> I have not, as the Defendants' have suggested, "opined that *the* proximate cause of Plaintiff's accident is the alterations to Cell 90 made by Defendant SAR." See Defendants' Brief at p. 24 (emphasis added). While SAR's actions were a contributing cause to Mr. Priester's fatality, based on my review of the information in the file and education, training and experience, the actions and inactions of Futuramic/Capital Welding were also a contributing cause to the fatality. Futuramic/Capital Welding enabled SAR's foreseeable actions by (A) delivering an incompletely designed and manufactured product (B) allowing the native logic software to be supplied to SAR without conditions or oversight necessary to ensure proper commission and completion of Cell 90 to its design intent.[21]

After being served with Plaintiff's opposition memorandum, including the affidavits of Mr. Ebersole and Mr. Eckhardt, and upon obtaining consent for an extension of time in which to respond, Futuramic and Capital submitted their joint reply to Plaintiff's summary judgment

---

[18] *See* Ebersole Aff., ¶ 10 *See also* Ex. 4, Ebersole Dep. at 36:6-37:8 (where, in response to the question "Name one. Name a detail that was not there in the PLC or the mechanical setup of cell 90 when it was delivered to Boeing on November 23rd?," Mr. Ebersole referred to "what I identified in my  report as Rung 47 of the Slider to Ladder Program," which is "the sub routine where the elements for communication detection and verification were in place with a placeholder, as I've identified in my report, for the design to be completed as will be done in the field to  test and verify that programming which is in place to provide for this detection."). *See also* Ex. 2, Ebersole Rep. at 32-33 (noting that as-delivered logic showed "40 instances of 'NOP' in the file," and that the "post-incident controller logic has the same exact number of NOP placeholders as the 'as delivered version' does.").

[19] *Id.* at 4-5; 22 (*citing* Ebersole Rep. at 4; 26; 35) (Ebersole Rep. attached hereto as Ex. 2).

[20] *See* Ex. 2, Ebersole Rep. at 35.

[21] *See* Ex. 6, Ebersole Aff., ¶ 26.

opposition on September 6, 2016.[22] That same day, Capital and Futuramic filed the instant motion to strike the affidavits of Mr. Eckhardt and Mr. Ebersole.[23] In their motion, Defendants have asserted, in essence, that both documents in question are so-called 'sham affidavits,'[24] which Plaintiff's experts have offered in an attempt to "offer new opinions" and to "modify and in some instances contradict prior opinions and testimony...."[25] Based on their characterization of the affidavits' contents, the Defendants maintain that they should be stricken, asserting that each was created in response to the Defendants' summary judgment motions and solely for the illegitimate purpose of showing the existence of disputed material factual issues.[26]

Plaintiff opposes Defendants' motion, and, as detailed herein, submits that the affidavits provided by Mr. Eckhardt and by Mr. Ebersole merely clarify each witness's previously expressed opinions, which were repeatedly mischaracterized by the Defendants in their summary judgment papers. As a result, Plaintiff respectfully requests that Defendants' motion be denied.

## II.    Legal Standard

"In order to avoid infringing upon the province of the fact finder, application of the sham affidavit rule at the summary judgment stage must be carefully limited to situations involving flat

---

[22] *See* Defs.' Reply. and Exs., Dkt. Nos. 86 to 86-6. Of note, on September 14, 2016, Plaintiff submitted her sur-reply in further opposition to the Defendants' summary judgment motions. *See* Dkt. No. 91.

[23] *See* Defs.' Mot. and Mem, Dkt. Nos. 87 and 87-1.

[24] *See e.g. Cothran v. Brown,* 357 S.C. 210, 218, 592 S.E.2d 629, 633 (2004) (where the South Carolina Supreme Court, citing *Pittman v. Atlantic Realty Co.,* 359 Md. 513, 754 A.2d 1030, 1042 (2000) noted "[i]n distinguishing between a sham affidavit and a correcting or clarifying affidavit, the following considerations provide guidance: (1) whether an explanation is offered for the statements that contradict prior sworn statements; (2) the importance to the litigation of the fact about which there is a contradiction; (3) whether the nonmovant had access to this fact prior to the previous sworn testimony; (4) the frequency and degree of variation between statements in the previous sworn testimony and statements made in the later affidavit concerning this fact; (5) whether the previous sworn testimony indicates the witness was confused at the time; (6) when, in relation to summary judgment, the second affidavit is submitted.)

[25] *See* Defs.' Mem. at 2, Dkt. 87-1.

[26] *Id.*

contradictions of material fact." *Ins. Prod. Mktg., Inc. v. Conseco Life Ins. Co.,* No. 9:11-CV-01269-PMD, 2012 WL 3308368, at *7 (D.S.C. Aug. 13, 2012) (*citing Mandengue v. ADT Security Sys., Inc.,* No. ELH–09–3103, 2012 WL 892621, at *18 (D.Md. Mar.14, 2012) (attached hereto as Ex. 7). "'[F]or the [sham-affidavit] rule...to apply, there must be a bona fide inconsistency' between an affiant's averments and his deposition testimony." *Wickersham v. Ford Motor Co*., No. 9:13-CV-1192-DCN, 2016 WL 3669995, at *9 (D.S.C. July 9, 2016) (*citing Kinser v. United Methodist Agency for the Retarded—W. N.C., Inc.,* 613 Fed.Appx. 209, 210–11 (4th Cir. 2015) (alterations in original) (*quoting Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n. 7 (4th Cir.2001)) (attached hereto as Ex. 8). Application of the "so-called 'sham affidavit rule'" is "inappropriate" where the affidavit in question "does not contradict [the witness's] deposition testimony." *See Kiesner v. Starbucks Corp.,* No. 1:12-CV-00448-JMC, 2013 WL 3479275, at *5, FN 3 (D.S.C. July 10, 2013) (*citing Mandegue,* 2012 WL 892621, at *17–18 (attached hereto as Ex. 9).

In addition, "Defendants bear a heavy burden in order to exclude an affidavit under the sham affidavit rule." *In re Stand "N Seal, Prod. Liab. Litig.,* 636 F. Supp. 2d 1333, 1335 (N.D. Ga. 2009). An expert's affidavit need not set forth statements which are "identical to the statements in her expert report…." *Id.* Moreover, it is clear that "some elaboration is allowed" in an expert witness's affidavit at the summary judgment stage. *Id.* (*citing Emcore Corp. v. Optium Corp.,* Civ. A. No. 6–1202, 2008 WL 3271553, at *4 (W.D.Pa. Aug.5, 2008) (allowing elaboration of "an opinion/issue previously addressed in [the expert's] report"); *Forest Labs., Inc. v. Ivax Pharms., Inc.,* 237 F.R.D. 106, 113 (D.Del.2006) (same)).

Furthermore, Rule 26(e)(2) notes that where an expert witness who has previously provided a report under Rule 26(a)(2)(B) subsequently develops *new opinions* beyond "the information in

the report and … information given in the expert's deposition," that "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3)[27] are due." *See* Fed. R. Civ. P. 26(e)(2). Furthermore, "Rule 26(e)(1) requires a party to supplement its experts' reports and deposition testimony when the party learns of new information. If the party fails to do so, the court may exclude any *new opinion* offered by the expert." *See S. States Rack And Fixture, Inc. v. Sherwin-Williams Co*., 318 F.3d 592, 595–96 (4th Cir. 2003) (*citing Tenbarge v. Ames Taping Tool Sys., Inc.,* 190 F.3d 862, 865 (8th Cir.1999)) (emphasis added). If a party offers *new expert opinions* and does not conform to the requirements of Rules 26(a), 26(e)(1) or 26(e)(2), "unless such failure is harmless," she is not "permitted to use as evidence at a trial ... any witness or information not so disclosed." *See* Fed. R. Civ. P. 37(c)(1).

Nonetheless, "Rule 37(c)(1) provides two exceptions to the general rule excluding evidence that a party seeks to offer but has failed to properly disclose: (1) when the failure to disclose is "substantial[ly] justifi[ed]," and (2) when the nondisclosure is 'harmless.'" *See S. States Rack And Fixture, Inc,* 318 F.3d at 595–96. The Fourth Circuit has promulgated a "five-factor test for determining whether nondisclosure of evidence is substantially justified or harmless: '(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony.'" *Id.* (internal citations omitted).

## III.    Argument

Defendants' arguments are untenable and provide no basis for striking either affidavit. These affidavits neither alter the opinions previously expressed by Mr. Eckhardt or Mr. Ebersole,

---

[27] Per Fed. R. Civ. P. 26(a)(3)(B), such disclosures "must be made at least 30 days before trial" except where "the court orders otherwise."

nor do they serve, as the Defendants incorrectly suggest, as a nefarious end-run by Plaintiff's experts around Rule 26 so that they may promulgate new opinions. Rather, these affidavits merely clarify Plaintiff's experts' testimony and opinions and, thus, are not subject to being stricken under either Rule 26 or 37 or under the 'sham affidavit' rule. For the sake of clarify, Plaintiff will first address the Defendants' contentions about Mr. Eckhardt, and then respond to those regarding Mr. Ebersole.

### A.  Defendants Have Mischaracterized Mr. Eckhardt's Testimony and Opinions.

Defendants have attempted to narrowly categorize the subject matter and scope of Mr. Eckhardt's testimony and opinions based on his deference to Mr. Ebersole on certain highly technical aspects of the logic control system used to operate the Sliders on Cell 90.[28] Based upon that categorization, Defendants now argue that Mr. Eckhardt's *entire* affidavit should be stricken based upon their citation of *three* paragraphs within that document, which they contend are beyond the scope of his prior testimony and opinions.[29] Specifically, Defendants contend that the following statements within Mr. Eckhardt's affidavit are improper and should not be considered by the Court:

> Contrary to the assertion contained in the Defendants' memorandum, Cell 90 was defective in its design and manufacture in part because it was delivered by Futuramic and Capital Welding with unfinished control logic and slider sensors that failed to detect the barrel, such that its design and manufacture were incomplete.[30]

> ….There is no evidence that Futuramic developed or executed a proper FAT. A proper FAT could only have been done if the system, including its controls were complete.[31]

---

[28] *See* Defs.' Mem. at 5, Dkt. 87-1.

[29] *See* Defs.' Mem. at 6, Dkt. 87-1 (in which the Defendants *only* reference ¶¶ 31, 40 and 56 of Mr. Eckhardt's affidavit as putatively containing opinions "on control systems…."). Even if the statements in ¶¶ 31, 40 and 56 of Mr. Eckhardt's affidavit *were* new, previously undisclosed opinions, which they are not, Defendants' have provided no justification for striking the entirety of Mr. Eckhardt's affidavit nor made *any* principled assertion that the balance of Mr. Eckhardt's affidavit is in anyway violative of the 'sham affidavit' rule or Rule 26.

[30] *See* Ex. 5, ¶ 31.

[31] *Id.,* ¶ 40.

Futuramic should have refused the contract and/or its alleged modifications, including allowing for the commissioning of the device by SAR, absent their execution of a proper FAT or other suitable validation and verification to ensure that safety critical aspects of their design had been satisfied.[32]

Defendants' assertions that Mr. Eckhardt's is only now opining on the above-noted topics is inaccurate. Furthermore, Defendants' position ignores the fact that Mr. Eckhardt's discussion of this subject was made necessary in order to clarify the Defendants' inaccurate representation of his opinions in their summary judgment filings.

### 1. Mr. Eckhardt's Opinions Regarding the Incomplete Design of Cell 90 Were Previously & Timely Disclosed.

Defendants' first contention in support of striking the entirety of Mr. Eckhart's affidavit is their claim that his affidavit improperly offers a new, undisclosed opinion that "Cell 90 was delivered and installed 'with unfinished control logic and slider sensors that failed to detect that barrel...'"[33] However, the opinion set forth in Paragraph 31 of Mr. Eckhardt's affidavit is a merely clarification of opinions he previously identified in both his expert report and his deposition; accordingly, the Defendants' motion should be denied.

First, in his expert report, Mr. Eckhardt clearly indicated that his "analysis revealed that the incident work platform *as designed, manufactured and introduced incompletely* into the stream of commerce by Futuramic, and Boeing's subcontractor SAR Automation was unreasonably dangerous, defective and unsuited for its intended purpose in a manner that caused Priester's fatal injury."[34]  Similarly, Mr. Eckhardt noted in his report that "the control scheme and the slider

---

[32] *Id.,* ¶ 56.
[33] *See* Defs.' Mem. at 6, Dkt. 87-1 (*citing* Eckhardt Aff., ¶ 31).
[34] *See.* Ex. 1 at 9 (emphasis added).

mechanisms were, and would be, prone to binding and inadequate and improper….”[35] Mr. Eckhardt likewise noted that “[h]ad Futuramic properly determined requirements for intended use, they would have designed a more reliable slider mechanism and *would have specified a control scheme* that incorporated feedback control of the sliders, and assured methods for safeguarding workers, including Priester, from exposure to floor openings resulting from (an) incompletely deployed slider(s).”[36]

Additionally, Mr. Eckhardt noted in his report that “[t]here is no evidence that Futuramic specified a proper control scheme to their subcontractors; neither Matthews nor Intec. Essentially Futuramic handed them Boeing’s descriptive specification ‘over the wall.’ In so doing, they delegated to their subcontractors what they themselves were responsible for.”[37] Likewise, Mr. Eckhardt also opined that “[p]roperly configured feedback control would have permitted the PLC to trigger safeguards including barrier interlock and appropriate warnings to operators,”[38] and that “Futuramic’s failure to specify and design the incident work platform with real time feedback control of the sliders violated sound principles of engineering and was a cause of Priester’s fatal injury.”[39]

After disclosing his Rule 26 report, containing the above noted findings, Mr. Eckhardt was deposed on February 3, 2016. In that deposition, Mr. Eckhardt testified as to his opinions regarding the programming and slider sensors, as stated in his report. While Mr. Eckhardt deferred to Mr. Ebersole on certain aspects of those issues, he nonetheless clearly and unambiguously identified his views to the Defendants. For example, Mr. Eckhardt specifically testified as to his opinion that

---

[35] *Id.* at 8.
[36] *Id.* at 21.
[37] *Id.* at 25.
[38] *Id.*
[39] *Id.*

Cell 90 "was not complete when it was delivered by Futuramic to Boeing," and that the system was incomplete because "there was still programming to be done."[40] Likewise, counsel for the Defendants specifically asked Mr. Eckhardt "Is it your opinion that Boeing accepted an incomplete system? Is that what you're telling me?" to which Mr. Eckhardt replied "Yes."[41] Similarly, Mr. Eckhardt testified at his deposition that ensuring completion of Cell 90's software, as well as the training of its ultimate users, "was Futuramic's responsibility as the system integrator…."[42]

Given the foregoing, the statement set forth in paragraph 31 of Mr. Eckhardt's affidavit is in line with the above-noted, previously disclosed and discussed opinions regarding the incompleteness of, and shortcomings with, the logic within Cell 90. As such, the opinion denoted in Paragraph 31 of Mr. Eckhardt's affidavit is neither new nor untimely, and the Defendants have failed to establish any basis for striking that portion, let alone the entirety, of Mr. Eckhardt's affidavit.

## 2. Mr. Eckhardt's Opinions on Deficiencies in the Product Realization & Testing of Cell 90 Were Previously & Timely Disclosed.

Defendants also assert that Mr. Eckhardt now, for the first time, "claims that Futuramic should have utilized a Factory Acceptance Test, or FAT test, to determine if the control system was incomplete,"[43] and, "[e]ven further, Eckhardt now asserts that Futuramic 'should have refused the contract and/or its alleged modifications' by SAR until a FAT test was performed."[44] Based upon their contention that these opinions, set forth in paragraphs 40 and 56 of his affidavit, were not previously disclosed by Mr. Eckhardt, Defendants therefore assert that the entirety of the

---

[40] *See* Eckhardt Dep., 66:9-24.
[41] *Id.* at 68:14-16.
[42] *Id.* at 86:23-69:3.
[43] *See* Defs.' Mem. at 6, Dkt. 87-1 (*citing* Eckhardt Aff., ¶ 40).
[44] *Id.,* (*citing* Eckhardt Aff., ¶ 56).

affidavit should be stricken. Nevertheless, as with their assertions regarding Mr. Eckhardt's opinion on Cell 90's incompleteness, here the Defendants' arguments regarding these two opinions are baseless.

Defendants' argument posits that, prior to issuing his affidavit, that Mr. Eckhardt never opined about testing Defendants could or should have undertaken to verify the completion of Cell 90 and its control systems. However, Mr. Eckhardt addressed the specific topic of Futuramic's role in the design and manufacture of Cell 90, and his opinions regarding the shortcomings in testing and verification, in great detail in his Rule 26 report. For example, in his report Mr. Eckhardt noted that "Futuramic was the Supplier and the Integrator" of Cell 90.[45] In describing that findings, Mr. Eckhardt noted that "Boeing issued a descriptive specification to Futuramic for the design/manufacture of the incident platform. Integral with that responsibility, Futuramic bore a responsibility to ensure that the platform would be delivered (i.e. introduced into the stream of commerce) *in a condition that was tested and commissioned*."[46] Indeed, Mr. Eckhardt noted that "Futuramic bore a responsibility to ensure that the platform *was complete, operational, free from defects and reasonably safe* and that the customer, Boeing and its employees, was fully trained in its operation."[47]

Likewise, in his report, Mr. Eckhardt noted that "[i]nstead of comprehensively and properly managing the design, manufacture and integration of the incident platform, Futuramic merely passed Boeing's descriptive specification to its subcontractors, *including the controls subcontractors*, without defining *a proper and complete control scheme for the platform*."[48]

---

[45] *See* Ex. 1 at 18.
[46] *See* Ex. 1 at 18. (emphasis added).
[47] *Id.* (emphasis added).
[48] *Id.* at 19.

Furthermore, Mr. Eckhardt opined in his report that "[h]ad Futuramic properly executed design and development of the incident platform, they would have, at a minimum, properly defined the roles and responsibilities of all parties through delivery and acceptance; properly defined input and output requirements for the design; properly specified characteristics essential for safe and proper use of the platform."[49]

Similarly, Mr. Eckhardt opined at length in his report about the importance of testing to ensure the completion and realization of products such as Cell 90.  For example, Mr. Eckhardt cited to ISO 9001 Quality Management Systems-Requirements in his report, which speaks to the necessity of validating and testing efficacy of products like Cell 90.[50] Indeed, Section 7.1 of ISO 9001, cited by Mr. Eckhardt, notes that "[i]n planning product realization," entities, like the Defendants, engaged in the realization of products, like Cell 90, "*shall determine ... [the] required verification, validation, monitoring, measurement, inspection, and test activities to the product and the criteria for product acceptance*."[51]

Moreover, Mr. Eckhardt noted in his report that Section 7.2 of ISO 9001 "further requires" that entities engaged in product realization to determine:

a) requirements specified by the customer, including the requirements for delivery and post-delivery activities,

b) requirements not stated by the customer but necessary for specified or intended use, where known,

c) statutory and regulatory requirements applicable to the product, and

d) any additional requirements considered necessary by the organization.[52]

---

[49] *Id.* at 23.
[50] *Id.* at 18-21.
[51] *See* Ex. 1 at 20 (emphasis added).
[52] *Id.* at 21.

On this point, Mr. Eckhardt expressly noted in his report that "[h]ad Futuramic properly determined requirements for intended use, they would have designed a more reliable slider mechanism and would have specified a control scheme that incorporated feedback control of the sliders, and assured methods for safeguarding workers, including Priester, from exposure to floor openings resulting from (an) incompletely deployed slider(s)."[53]

Likewise, Mr. Eckhardt specifically opined that "[h]ad Futuramic properly validated or tested the efficacy of the incident platform sliders, they would have realized the sliders were insufficiently reliable, and they would have realized that workers, including Priester, could be exposed to a fall hazard."[54] Mr. Eckhardt also noted that "Futuramic's *failure to validate or test* the efficacy of the incident platform sliders deprived Priester of protections afforded by industry, and was a cause of Priester's fatal injury."[55]

Furthermore, Mr. Eckhardt's opinions regarding the lack of adequate testing and realization were disclosed and discussed at his February 3, 2016, deposition. For example, Mr. Eckhardt specifically answered in the affirmative when asked "You said, had Futuramic properly validated or tested the efficacy of the incident sliders, Priester's injury would have been prevented, is that correct?"[56] Similarly, Mr. Eckhardt specifically answered the inquiries on that subject, as noted in the following exchange from his deposition:

> Q. In planning product realization, the organization shall determine the following as appropriate: A, quality objectives and requirements for the product. Do you believe that Futuramic did that?
>
> A. No.

---

[53] *Id.*
[54] *Id.* at 20 (emphasis added).
[55] *Id.* at 29 (emphasis added).
[56] *Id.* at 185:16-20.

Q.  B, the need to establish processes and documents and to provide resources specific to the product. Do you believe that Futuramic did that?

A. No.

Q.  C, *required verification, validation, monitoring, measurement, inspection and test activities specific to the product and the criteria for product acceptance.* Do you believe Futuramic did that?

A. *No.*[57]

Likewise, Mr. Eckhardt testified that the "design liability, the realization of [Cell 90] as a safe, functioning comprehensive product was up to Futuramic," and that Futuramic's responsibility for the design of Cell 90 arises from "application of found principles of engineering as reflected in the ANSI standards and the various citations that I have," as well being "directly tied to the ISO 9001 quality program, which Futuramic says they have and says that they adhere to and Boeing would expect them to comply with…."[58]  Furthermore, Mr. Eckhardt stated that "Futuramic was the overall system integrator," and "as the specification was done, the descriptive specification, they had a responsibility to realize this product to the end. So when it was turned over to Boeing *in an incomplete fashion*, I believe Futuramic still had a role in understanding what was going on, making sure that the end result was safe…."[59]

When read together, both Mr. Eckhardt's report and deposition testimony indicate that he has consistently offered opinions on the shortcomings in the testing and realization activities conducted by the Defendants to ensure the safety and completeness of Cell 90. Mr. Eckhart's opinions, set forth in paragraphs 40 and 56 of his affidavit, simply clarify and reiterate his prior findings, *inter alia,* that "the incident work platform" was "designed, manufactured and introduced

---

[57] *See* Eckhardt Dep., Ex. 3, at 183:24 – 184:13 (emphasis added).
[58] *Id.* at 75:5-7.
[59] *See* Eckhardt Dep., Ex. 3, at 77:10-19.

*incompletely* into the stream of commerce by Futuramic,"[60] and that "Futuramic's failure to *validate or test* the efficacy of the incident platform sliders deprived Priester of protections afforded by industry, and was a cause of Priester's fatal injury."[61]   As such, Defendants' have failed to establish any basis for striking Mr. Eckhardt's affidavit.

### B.  The Defendants Have Mischaracterized Mr. Ebersole's Findings.

While the Defendants have identified only three paragraphs in Mr. Eckhardt's affidavit as putatively offering new, untimely opinions, they have moved to strike Mr. Ebersole's affidavit based upon their assertion that "[p]rior to Plaintiff's Opposition Brief, Ebersole had no opinions as to Futuramic in either his written report or deposition testimony."[62] Defendants' assertions regarding Mr. Ebersole are contrary to the factual record and should be rejected.

### 1.  Mr. Ebersole's Report Expressed His Opinions Regarding the Defendants.

First, contrary to the Defendants' claims, Mr. Ebersole set forth a number of findings regarding Futuramic and Capital in his December 22, 2015 Rule 26 report. Mr. Ebersole's report denotes that "Boeing hired Futuramic to design and manufacture a work platform vehicle for use by Boeing employees for working on barrel sections of fuselages in airplanes..."[63] Mr. Ebersole also clearly opined that Futuramic was responsible for providing a work platform that would meet the applicable ANSI standards, noting that "Boeing provided a specification to Futuramic that included references to…ANSI A92.6 Self Propelled Elevating Work Platforms. Boeing hired Futuramic to provide a system that would meet these requirements."[64]  Likewise, Mr. Ebersole noted that the "ANSI/SIA A92.6-2006 – Self Propelled Elevating Work Platforms – 4.

---

[60] *See.* Ex. 1 at 9 (emphasis added).
[61] *Id.* at 29 (emphasis added).
[62] *See* Defs.' Mem. at 2, Dkt. No. 87-1.
[63] *See* Ex. 2, Ebersole Rep. at 3.
[64] *Id.* at 24.

Responsibilities of Manufacturers – 4.13.2 Guardrail system" standard denotes that "[t]he platform shall include a guardrail system around its periphery…."[65] Mr. Ebersole also opined that as designed by Futuramic, Cell 90 "relied on the presence of the fuselage for providing the guardrail at the periphery along the fuselage side of the platform."[66] Furthermore, Mr. Ebersole unambiguously stated that "the failure to complete the design was a failure to meet the ANSI A92.6 Self Propelled Elevating Work Platforms standard."[67]

Likewise, in discussing Futuramic's attempts to discharge its obligations in designing and manufacturing Cell 90, Mr. Ebersole noted that "Futuramic initially hired Matthews for design of the control and electrical systems. Matthews purchased components…. When Futuramic determined that Matthews would not be able to meet the required schedule they hired Intec to take over the design of the electrical control systems and provide programming for the controller, drives, and touch screen."[68] Mr. Ebersole also noted that Futuramic's subcontractor "Intec anticipated eventually finishing the software during commissioning at the Boeing facility which is customary practice."[69]

Moreover, Mr. Ebersole clearly denoted that, as delivered to Boeing by Futuramic and Intec, that the logic with Cell 90 was incomplete as the "… program was marked with an NOP (No Operation) instruction as a placeholder for follow up during commissioning."[70] Mr. Ebersole also opined that Futuramic was aware of the dissemination of the native logic software to SAR,[71]

---

[65] *Id.* at 25.
[66] *Id.*
[67] *See* Ex. 2, Ebersole Rep. at 29.
[68] *Id.*
[69] *Id.* at 4.
[70] *Id.* at 25.
[71] *Id.* at 20 (citing FUTURAMIC 001628 and noting that it was "An email from Scott Krueger of Intec dated November 26, 2012 includes, 'Gentleman, Here are all of the Latest Files as of October

and that Intec, the entity that Futuramic retained to assist with completion of the logic in Cell 90, "should have made an effort to inform and caution that the system was not complete, that it would need to be completed and checked out during the commissioning, and recommended against it being done by others."[72] Indeed, Mr. Ebersole also clearly noted that the email sent to SAR, relaying the native logic programming --- on which Tom Blum of Futuramic was copied --- "did not provide caution regarding the incompleteness of what was being sent."[73]

Mr. Ebersole also opined that after being retained by Futuramic, "Intec had prepared logic for monitoring and verifying successful communication to the number 2 slider but it was not completed at commissioning."[74] Likewise, Mr. Ebersole noted that had Futuramic and Intec acted to ensure that "the communication verification logic had been completed, an alarm would have occurred when slider number 2 drive failed to respond."[75] Indeed, Mr. Ebersole has opined that had Futuramic, Intec or SAR acted to ensure that "the system had been completed according to the Intec design the communication failure would have been detected, an alarm would have occurred, all sliders would have stopped movement, and the platform would not have been used until the problem with communications could be corrected."[76] Indeed, Mr. Ebersole has noted that "[a] properly completed design would have included verification of drive response."[77]

In addition, Mr. Ebersole stated in his report that "[t]he design that was not completed during the commissioning failed to verify successful communications and failed to verify

---

31st 2012. The .mer file is the Panelview. The .ACD is the PLC Program. The .zip file is the Lenze Drive Software Files.'").

[72] *Id.* at 34.

[73] *See* Ex. 2, Ebersole Rep. at 34.

[74] *Id.* at 26.

[75] *Id.*

[76] *Id.*

[77] *Id.* at 27.

successful positioning of the sliders."[78] Moreover, Mr. Ebersole identified in his report that "[t]he post incident controller logic has the same exact number of NOP placeholders as the "as delivered version" does, indicating not only that the logic within Cell 90 was not completed at the commissioning of the device, but that it was, in fact, incomplete when delivered to Boeing by Futuramic, Capital and Intec.[79]  As such, Mr. Ebersole's Report clearly identifies the actions that should have been taken by both Futuramic and Intec. Mr. Ebersole's report identifies a host of reasons where Futuramic, as the manufacturer and designer of Cell 90, had responsibility for ensuring the safety, testing and design of Cell 90 and the work of its subcontractors, such as Intec. Consequently, the Defendants' motion to strike Mr. Ebersole's affidavit is specious.

**2. Mr. Ebersole's Deposition Also Clearly Established That He Was Offering Opinions Regarding the Moving Defendants.**

Mr. Ebersole's deposition testimony also affirmatively set forth his findings not only about SAR, but also those regarding the moving Defendants.  For example, at his deposition Mr. Ebersole testified that "at the point that it was shipped," Futuramic had conducted "preliminary testing" on Cell 90 and the intent was that "that there would be continuation of the control system at the Boeing location."[80]  Likewise, Mr. Ebersole testified extensively at his deposition as to his opinions regarding the incompletion of the manufacture and design of Cell 90 at the time it was delivered to Boeing by the moving Defendants. Specifically, the following exchange occurred at Mr. Ebersole's February 19, 2016, deposition:

> Q.  What was not there on November 23rd as to its intended use as a working platform?

---

[78] *See* Ex. 2, Ebersole Rep. at 29.
[79] *Id.* at 33.
[80] *See* Ebersole Dep. at 18:17-20.

A.  *What was not there was a commissioned control system* -- I'd like to finish my answer --

Q.  Sure.

A.  -- *that included all the necessary things to make this a safe work platform*. Necessary to be completed still was *commissioning, testing, verification programming* to make it a complete system.

Q.  What was not there on the platform that prevented it from being used to roll up to a section of the body, send out the sliders, and work on the platform of cell 90? What was not there?

A.  Commissioning had not been done in a way that completed the software and control and verification to make it a safe system.

Q.  What was not there about the software?

A.  *The design included what would complete verification of communications, an alarm system and prevention of the system from continuing*.[81]

Furthermore, Mr. Ebersole was asked specifically about his opinions regarding the incompleteness of the control software within Cell 90 at the time it was delivered by the moving Defendants, as the question "[w]hat was not there about the PLC for the controls and the alarm system when Intec and Futuramic delivered it to Boeing?" was posed to him; in response, Mr. Ebersole clearly noted that "[w]hat was not there was the steps that are necessary when machinery is commissioned to complete it to its design."[82]

Likewise, Mr. Ebersole noted the following in response to questioning at his deposition:

Q.  What was not there on November 23rd that prevented it from operating as fully intended by Futuramic and Intec?

A.  What was not there was the commissioning that was necessary.

---

[81] *See* Ex. 4, Ebersole Dep. at 33:14-34:6 (emphasis added).
[82] *Id.* at 34:10-15.

Q.  I'm talking about -- not commissioning.  I'm talking about physical properties, electronic properties, mechanical properties that were not there?

MR. ROZELSKY:  Object to the form.

THE WITNESS:  *There was software and hardware that was still awaiting completion.*

BY MR. WALL:
Q.  What software?

A.  *There was software for making up a complete control and alarm system that would allow it to meet reasonable standards.*[83]

Moreover, Mr. Ebersole was asked at his deposition to "Name one.  Name a detail that was not there in the PLC or the mechanical setup of cell 90 when it was delivered to Boeing on November 23rd."[84] In response, he identified the NOPs which were detailed in both his Report and in now in his affidavit, noting, "[w]ell, I'll start with what I identified in my report as Rung 47 of the Slider to Ladder Program – Slide to Ladder Program," which Mr. Ebersole noted was "the sub routine where the elements for communication detection and verification were in place with a placeholder, as I've identified in my report, for the design to be completed as will be done in the field to test and verify that programming which is in place to provide for this detection."[85] Moreover, Mr. Ebersole noted that the testing of Cell 90 was not completed, as the analysis conducted by Futuramic was "specifically done as a piece of machinery manufacturing when the equipment was on the test floor *in preparation for software continuation and completion.*[86]

In addition, contrary to the Defendants' assertion that Mr. Ebersole did not opine on either the incompleteness of Cell 90 as delivered *or* the foreseeability to Futuramic and Capital of the

---

[83] *Id*. at 35:4-19 (emphasis added).
[84] *See* Ex. 4, Ebersole Dep. at 36:6-8.
[85] *Id.* at 36:9-18.
[86] *Id*. at 36:6-37:8.

need for proper commissioning before it was used at Boeing, at his deposition Mr. Ebersole clearly opined that "anybody who knows anything about equipment manufacturing, such as this, knows that that machine, when it came in the door, was not ready for use until it was commissioned."[87] This testimony further establishes his opinions regarding the incompleteness of the manufacture and design of Cell 90 at the time it was delivered by the moving Defendants to Boeing, as well as the foreseeability to the Defendants that, in the absence of proper commissioning, Cell 90 could and would pose a risk to its users and consumers.

Furthermore, although Mr. Ebersole clearly offered his opinions regarding the Defendants in both his Rule 26 report and in the initial portion of his deposition, counsel for the moving Defendants *did not ask Mr. Ebersole whether he had any opinions regarding Capital or Futuramic*.[88] Nevertheless, Mr. Ebersole did clearly opine that the design and manufacture of Cell 90 was not complete at the time it was delivered to Boeing by the moving Defendants, a condition which exacerbated after deliver as "there was a commissioning that was not completed, which resulted in the system not being completed to the design...."[89] The Defendants now complain that Mr. Ebersole's affidavit is untimely, but, as detailed herein, Mr. Ebersole's opinions were expressed in both his deposition and report. In truth, Defendants' criticism of Mr. Ebersole's affidavit stems not from any legitimate issue but rather arise precisely because Mr. Ebersole utilized his affidavit to clarify his previously expressed views,[90] thereby allowing the Plaintiff to

---

[87] *Id.* at 39:4-7.
[88] *See* Ex. 4, Ebersole Dep. at 68:9-74:15
[89] *Id.* at 72:7-9.
[90] *See* Pl.'s Mem. Opp. Summ. J., Dkt. 82, at 31-33. *See also* Ex. 6, Ebersole Aff., ¶¶ 20-26; *and see* Ex. 2, Ebersole Rep. at 35.

debunk Defendants' specious argument that Mr. Ebersole's findings support their defense that SAR's actions were the sole proximate cause of the Plaintiff's injuries.[91]

### C. Defendants Have Failed To Establish A Basis For Striking Either Affidavit.

Defendants assert that the affidavits from Mr. Eckhardt and Mr. Ebersole should be stricken as untimely under Rule 26. Defendants cite to *Barwick v. Celotex Corp.*, 736, F.2d 946, 960 (4th Cir. 1984), as support for their position. In *Barwick,* the plaintiff offered an affidavit after defendants in an asbestos action moved for summary judgment on the basis that the plaintiff's claims were barred due to a lack of production identification and under a statue of repose. In that case, the Fourth Circuit upheld a grant of summary judgment, noting that the affidavit under consideration was "conclusory, it [did] not set forth facts of which the plaintiff [had] personal knowledge, and it [did] not give specific facts, but only generalities." *Id.* Furthermore, in the affidavit in *Barwick* contained statements by the plaintiff which contradicted his prior deposition testimony about the circumstances regarding his exposure to asbestos-containing products. Here, however, the statements contained in the affidavits of both Mr. Eckhardt and of Mr. Eckhardt are

---

[91] Defendants assert that Mr. Ebersole unequivocally stated in his deposition testimony that "'the' proximate cause of Plaintiff's accident" was the modifications to Cell 90 made by SAR. *See* Defs.' Mem. at 10. As Defendants' memorandum notes, the question posed to Mr. Ebersole was "Did you make a determination as to what was the proximate cause of the failure of Slider 2 on the night of the incident?," *not* "Did you make a determination as to what was the proximate cause of the Plaintiff's accident." *Id.* (citing Ebersole Dep. at 72:17-19). Moreover, Mr. Ebersole's response to the actual question posed notes in pertinent part that "[t]he failure was a result of loss of communication." *See* Ex. 4, Ebersole Dep. at 72:21-22. Furthermore, Mr. Ebersole had already testified that the alarm system within Cell 90 was not fully operational at the time it was delivered by the Defendants to Boeing, noting that "[t]he testimony and the evidence shows there were details to be done as part of the commissioning, like is customary in machinery, manufacturing and commissioning there were those details that … needed to be completed." *Id.* at 35:24-36:5. Likewise, as noted above, Mr. Ebersole had also testified regarding the incompleteness of Cell 90 as delivered by the Defendants, and, similarly, had opined in his report that if the incomplete system provided by the Defendants "had been completed according to the Intec design the communication failure would have been detected, an alarm would have occurred, and all sliders would have stopped movement…." *See* Ex. 2, Ebersole Rep., at 26.

neither conclusory nor lacking in specificity. Moreover, as detailed extensively above, neither of the affidavits here were offered to, or do in fact, contradict the Rule 26 Reports *or* deposition testimony of Mr. Eckhardt or Mr. Ebersole.

In point of fact, the Defendants have failed to establish the threshold issue that either of the affidavits deviates so substantially from the experts' properly disclosed reports and deposition testimony so as to constitute a "supplementation" under Rule 26(e). Indeed, when an expert setting forth his opinions at the summary judgment stage via affidavit, "some elaboration is allowed." *See In re Stand "N Seal, Prod. Liab. Litig.*, 636 F. Supp. at 1336 (internal citations omitted).

Furthermore, while Plaintiff reiterates that opinions set forth in the affidavits are neither new nor untimely, even assuming *arguendo* that some or all of the opinions set forth in the affidavits were deemed to be supplementary under Rule 26(e)(2), they would still be timely. Specifically "[a]ny additions or changes [to an expert's report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." *See* Fed. R. Civ. P. 26(e)(2). Per Fed. R. Civ. P. 26(a)(3)(B), pretrial disclosures "must be made at least 30 days before trial" except where "the court orders otherwise." While it does not appear that the October 17, 2016 trial date noted by the Defendants will occur,[92] there can be no dispute that both the affidavits at issue were supplied far earlier than 30 days before trial.

Moreover, even if some of the contentions in the affidavits were deemed to somehow go beyond Plaintiff's experts' previously disclosed opinions, the timing of the disclosure of these opinions is harmless. Specifically, the Defendants were on notice, via the expert reports and testimony, of both experts' opinions regarding Futuramic and Capital, the Defendants will be able to cure any putative prejudice at trial through cross-examination regarding the alleged

---

[92] *See* Defs.' Mem. Supp. At 10.

inconsistencies, there will be no disruption of the trial of this matter by allowing the testimony, and both witnesses were already disclosed.  *See S. States Rack And Fixture, Inc,* 318 F.3d at 595–96.

## IV.    Conclusion

As detailed herein, the affidavits supplied by Mr. Eckhardt and Mr. Ebersole merely reiterate and clarify their opinions regarding the Defendants that were previously addressed in their respective Rule 26 reports and deposition testimony. As such the Defendants have failed to establish any principled basis for striking those affidavits under Rules 26 or 37, or under the 'sham affidavit' rule.  Consequently, Plaintiff respectfully requests that Defendants' motion be denied.


Respectfully submitted, this the 23rd day of September, 2016,


**MOTLEY RICE LLC**

By:     s/ Kevin R. Dean
_____
Kevin R. Dean
*Federal Bar No.:  8046*
Anne McGinness Kearse
*Federal Bar No.: 7570*
W. Christopher Swett
*Federal Bar No.: 11177*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
(843) 216-9000 |(843) 216-9440 (Facsimile)
kdean@motleyrice.com
akearse@motleyrice.com
wswett@motleyrice.com