**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| LISA J. PRIESTER, individually, and as Personal Representative of the Estate of David A. Priester, Jr., | ) ) ) ) | |
| Plaintiff, | ) ) | No. 2:14-cv-01108-DCN |
| vs. | ) ) | |
| FUTURAMIC TOOL & ENGINEERING COMPANY; CAPITAL WELDING, INC.; MCMASTER-CARR SUPPLY COMPANY; INTEC AUTOMATED CONTROLS, INC.; and SAR AUTOMATION, L.P., | ) ) ) ) ) ) ) | **ORDER** |
| Defendants. | ) ) ) | |

This matter comes before the court on (1) defendants Futuramic Tool & Engineering Company's ("Futuramic") motion for partial summary judgment as to plaintiff Lisa Priester's ("Priester") strict liability claims, (2) defendant SAR Automation, L.P.'s ("SAR") motion for partial summary judgment as to Priester's strict liability claims, and (3) defendant Capital Welding Inc.'s ("Capital Welding") motion for summary judgment as to all of Priester's claims. The court (1) grants in part and denies in part Futuramic's motion for partial summary judgment as to Priester's strict liability claims; (2) grants in part and denies in part SAR's motion for partial summary judgment as to Priester's strict liability claims; (3) grants in part and denies in part Capital Welding's motion for complete summary judgment as to all of Priester's claims.

1

# I.  BACKGROUND

This litigation arises out of a fatal accident at the Boeing manufacturing facility in North Charleston, South Carolina.  ECF No. 75 at 1.  On March 18, 2013, the decedent, David Priester ("Mr. Priester")[1] was working on an elevated work platform ("Cell 90") when he fell through an opening eighteen feet above the concrete floor.  Id.  Cell 90 was designed with eighteen movable sliders which extend at varying lengths to conform to the curving nature of the body of the aircraft barrel. Id. at 4–5.  The design of Cell 90 called for the sliders to be no more than three inches from the aircraft barrel.  Id.  At the time of the incident, Mr. Priester and four other Boeing employees were working on Cell 90, and following the last shift break attempted to extend the sliders to continue working on the aircraft.  However, Slider #2 did not extend the entire length to the body of the aircraft, leaving a gap between the end of Slider #2 and the body of the aircraft.  ECF No. 88 at 3.  Mr. Priester and his teammates continued to work on the platform, and after working for approximately one hour on Cell 90, Mr. Priester fell through the gap between Slider #2 and the aircraft barrel.  ECF No. 88 at 4.  Mr. Priester later died as a result of the injuries sustained from the fall.  ECF No. 75 at 1.  Priester is the widow of Mr. Priester and the personal representative of his estate.  Id.

Priester filed the present suit on March 24, 2014 against Futuramic, Capital Welding, McMaster-Carr Supply Company, and Intec Automated Controls, Inc.  She asserts strict liability claims against Futuramic, Capital, and McMaster-Carr, and

---

[1] For clarity, the court refers to Lisa Priester, who is the plaintiff in this case, as "Priester" and decedent David Priester as "Mr. Priester."

causes of action for negligence, loss of consortium, and punitive damages against all defendants.[2]  ECF No. 88 at 2.  On September 17, 2014, Priester amended her complaint to add SAR as a defendant.  ECF No. 88 at 2.

Capital Welding filed a motion for summary judgment on all of Priester's claims on July 1, 2016, ECF No. 75, and Priester responded on August 18, 2016, ECF No. 82, to which Capital Welding replied on September 6, 2016, ECF No. 86. Futuramic filed a motion for partial summary judgment on Priester's strict liability claims on July 1, 2016, ECF No. 76, and Priester responded on August 18, 2016, ECF No. 82, to which Futuramic replied on September 6, 2016, ECF No. 86.  SAR filed a motion for partial summary judgment on September 13, 2016, ECF No. 88, and Priester responded on October 21, 2016, ECF No. 99, to which SAR replied on November 4, 2016, ECF No. 102.  The court held hearings on the motions, which are now ripe for the court's review.

## II.  STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the

---

[2] Futuramic is the manufacturer of Cell 90.  ECF No. 75 at 1.  Capital Welding, the fabrication division of Futuramic, performed the fabrication and assembly work for Cell 90, and installed it at the Boeing facility.  Id.  Intec installed the electronics and provided the programming for Cell 90.  Id.  SAR performed modifications to Cell 90 after it was delivered and installed in the Boeing facility, including the modifications of slider brake controls and additional manual control of the sliders by the operators.  Id.

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  Any reasonable inferences are to be drawn in favor of the nonmoving party.  See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012).  However, to defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact.  See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.  See Anderson , 477 U.S. at 252; Stone, 105 F.3d at 191.  Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'"  Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)).  If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'"  Id. (quoting Anderson, 477 U.S. at 248).

## III.  DISCUSSION

### A.    SAR's Motion for Partial Summary Judgment as to Priester's Strict Liability Claims

SAR brings a motion for partial summary judgment as to Priester's strict liability claims, arguing that Priester has not presented sufficient evidence to support a theory based on strict liability for manufacturing defect, design defect, or failure to warn.  ECF No. 88 at 7.  The court grants SAR's motion for summary judgment as it relates to strict liability for failure to warn and the design defect claim, but denies the motion as it relates to the manufacturing defect claim.[3]

---

[3] As a threshold matter, Priester's manufacturing and design defect strict liability claims against SAR are based on SAR's alleged noncompliance with American National Standard Institute ("ANSI") A.92.6-2006, which is an industry standard regarding the design and manufacture of Cell 90.  ECF No. 99, Ex. 1 at 24. SAR argues that the scope of its work on Cell 90 was never related to the platform, and instead was confined to an "enhancement of the slider operation" and the installation of a redundant brake system.  ECF No. 102 at 3.  It appears that SAR is arguing that the ANSI 92.6-2006 standard does not apply to any work it performed because it is not a "remanufacturer" within the meaning of the standard, and so Priester's arguments regarding a manufacturing and design defect are impermissibly expansive.  Id. at 4.  There is a disagreement between the parties' experts on this issue.  Priester's expert Eckhardt testifies in his report that by agreeing to commission the system, "[p]er ANSI, SAR effectively stood in the shoes of the original manufacturer."  ECF No. 99, Ex. 2, Eckhardt Report at 18.  Ebersole, another one of Priester's experts, also notes that SAR is considered a remanufacturer under the ANSI standards, and so assumes "the responsibilities of a manufacturer as set forth in section 4 of the [ANSI standard]."  ECF No. 99, Ex. 1, Ebersole Report at 30.  On the other hand, Futuramic and SAR's expert Paul Turner ("Turner") opines that SAR did not meet the definition of remanufacturer.  ECF No. 89, Ex. 4, Turner Dep. at p. 6 ("[P]er the definition and the standard of remanufacture, SAR did not meet that definition.").  The court reiterates a key holding from its January 18, 2017 order on the motions to exclude: the reasonable difference of opinion between the parties' experts does not make the challenged representation—that ANSI 92.6-2006 is the applicable standard—literally false.  At this point, it is undisputed that Ebersole, Eckhardt, and Turner all qualify as experts.  The evidence on both sides therefore "sets up a battle of the experts, which should not be resolved at summary judgment." Reyazuddin v. Montgomery Cnty., Maryland, 789 F.3d 407, 417 (4th Cir. 2015).  A

In South Carolina, "[t]here are three defects a plaintiff in a products liability lawsuit can allege: 1) a manufacturing defect, 2) a warning defect, and 3) a design defect." Watson v. Ford Motor Co., 699 S.E.2d 169, 174 (S.C. 2010). "When a manufacturing defect claim is made, a plaintiff alleges that a particular product was defectively manufactured." Id. "When a warning defect claim is made, a plaintiff alleges that he was not adequately warned of dangers inherent to a product." Id. Finally, "[w]hen a design defect claim is made, a plaintiff alleges that the product at issue was defectively designed, thus causing an entire line of products to be unreasonably dangerous." Id. A plaintiff must establish three elements for a products liability case based on the theory of strict liability: (1) he was injured by the product; (2) the injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant. Bragg v. Hi-Ranger, Inc., 462 S.E.2d 321 (S.C. Ct. App. 1995). While under any products liability theory the plaintiff must show that a product defect was a proximate cause of his injuries, "proximate cause does not mean the sole cause" and a "defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury." Small v. Pioneer Mach., Inc., 494 S.E.2d 835, 842 (S.C. Ct. App. 1998). As SAR moves for summary judgment on the manufacturing

---

reasonable jury could find that SAR was considered a remanufacturer or that SAR was not considered a remanufacturer under ANSI. Viewing the facts in the light most favorable to Priester as the non-moving party, for the purposes of this summary judgment motion the court finds that SAR was a "remanufacturer" under ANSI and that it did have to comply with ANSI 92.6-2006.

defect, design defect, and failure to warn claims, the court analyzes each of these in turn.

### 1.    Manufacturing Defect

SAR argues that there is no strict liability based on manufacturing defect because it had no part in the initial manufacturing of Cell 90, and that its addition of redundant brakes to Cell 90 and disabling laser sensors was performed "at the request of Boeing." ECF No. 88 at 8. SAR argues that it was a communication loss between the logic software[4] and the electrical system, and not a mechanical issue associated with SAR's addition of redundant brakes and disabling of laser sensors, which prevented Slider #2 from extending fully, resulting in the gap that Mr. Priester fell through. ECF No. 88 at 10. Citing discrepancies between SAR's quote to Boeing and what it actually provided, Priester argues that SAR "failed to complete" its work on the manufacture of Cell 90. ECF No. 99 at 14. The court is persuaded by the argument that there are genuine issues of material fact as to whether SAR's actions contributed to the defective condition of Cell 90 on the night of Mr. Priester's fall.

The court recognizes there is some ambiguity in the distinction between what is required to establish a manufacturing defect claim as opposed to a design defect claim. The court in Fisher v. Pelstring, 817 F. Supp. 2d 791, 818 (D.S.C. 2011), on reconsideration in part (Jan. 11, 2012), acknowledged this, stating that there is "not an abundance of case law in South Carolina about how a manufacturing defect differs from other defects." However, the Fisher court noted that courts have identified a

---

[4] "Logic" refers to the software involved in the operation of the sliders in Cell 90. ECF No. 99 at 17.

manufacturing defect as existing "when a product does not conform to the design standards and blueprints of the manufacturer and the flaw makes the product more dangerous and therefore unfit for its intended or foreseeable uses." Id. (citing Gerber v. Hoffmann-La Roche Inc., 392 F. Supp. 2d 907, 922 (S.D. Tex. 2005)).  The Fisher court also cited Wheeler v. HO Sports, Inc., 232 F.3d 754, 757 (10th Cir. 2000), where the Tenth Circuit applied Oklahoma law to determine that "a product is defective in manufacture if it deviates in some material way from its design or performance standards . . . [which is] often established by showing that a product, as produced, failed to conform with the manufacturer's specifications."  Other courts within this circuit have also framed manufacturing defects as a defect that occurs when the final product does not conform to specifications.  See e.g., Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378, 411 (D. Md. 2001) (Noting that "[c]ourts have not always been clear in distinguishing the proof needed to establish a design defect as opposed to a manufacturing defect . . . [but that] [t]o avoid defendants' motion for summary judgment [on the manufacturing defect claim], plaintiffs must offer evidence of some indication that the product at issue [] was not manufactured in accordance with the product's design specifications[.]")

Here, SAR's Price Quotation for the work it performed on Cell 90 stated that it would include "design work up to the interface terminal strip," the provision of "[g]eneral Logic for slider operation" and an "[a]larm horn with selectable tone," as well as "commissioning,[5] testing and training."  ECF No. 99, Ex. 11, SAR Quotation.

---

[5] The term "commissioning" is used frequently in the briefing for this motion. According to Priester's expert Daryl Ebersole ("Ebersole"), commissioning

8

According to Ebersole, SAR's commissioning of Cell 90 "resulted in the system not being completed to the design, and this was a cause" of Slider #2 not extending fully. Id., Ex. 4, Ebersole Dep. at 71:20-72:9. Ebersole further opines that SAR failed to review the controller logic to ensure that it was complete, and as a result, Cell 90's sliders were never completed. ECF No. 82, Ex. 1, Ebersole Report at 33. While Intec designed the communication verification logic, SAR also played a role in the installation of the logic—it is during the commissioning process that SAR was responsible for verifying that all requirements were met, including that the system that Intec designed to stop movement of all sliders was properly installed and functional. ECF No. 82, Ebersole Report at 26. By not completing the commissioning as designed, Ebersole states, SAR's inactions contributed to Cell 90 being put into use in a manner different from the original design of the platform. Id.

The court finds that Priester has presented enough evidence to present a genuine issue of material fact that SAR's actions in incompletely commissioning Cell 90 contributed to Cell 90 being left in a state where it did not conform to its intended design. A reasonable jury could find that the failure of Cell 90 to sound an alarm

_____

equipment refers to "starting it up, verifying its operation, verifying that all requirements are met, [and] verifying safety aspects." ECF No. 99, Ex. 4, Ebersole Dep., at 7:6-8. During the January 24, 2017 hearing, the parties seemed to disagree on what commissioning consisted of with respect to Cell 90 and if SAR's commissioning of Cell 90 constituted an extension of manufacturing or a post-manufacturing verification process. Ebersole opines that finishing the software during commissioning at the Boeing facility is the "customary practice" in the industry. ECF No. 82, Ex. 1, Ebersole Report at 4. Viewing the facts in the light most favorable to Priester as the non-moving party, and for the purposes of this summary judgment motion only, the court finds that SAR's commissioning of Cell 90 could be viewed as part of the manufacturing process because Cell 90 would not be complete according to Boeing's specifications without complete logic software.

when Slider #2 did not fully extend on the day of Mr. Priester's fall was as a result of SAR's incomplete commissioning of Cell 90's logic.  For Priester to survive summary judgment, the jury need not find—as SAR urges—that SAR's incomplete commissioning was the only act that led to Mr. Priester's fall.  In <u>Small</u>, the court held that a "defendant's conduct can be a proximate cause if it was <u>at least one</u> of the direct, concurring causes of the injury."  <u>Small.</u>, 494 S.E.2d at 842 (emphasis added).  There is a genuine issue of material fact as to whether SAR's role in the commissioning of Cell 90 failed to ensure that Cell 90 conformed to the ANSI A92.6 specifications and contained completed logic software.  Accordingly, the court denies summary judgment on the manufacturing defect issue.

### 2.    Design Defect[6]

Second, SAR argues that there is no strict liability based on design defect.  A plaintiff proceeding under a design defect claim in South Carolina must "'point to a design flaw in the product and show how his alternative design would have prevented the product from being unreasonably dangerous.'"  <u>Graves v. CAS Med. Sys., Inc.</u>, 735 S.E.2d 650, 658 (2012) (quoting <u>Branham</u>, 701 S.E.2d at 16), <u>reh'g denied</u> (Dec. 12, 2012).  In presenting the alternative design, the plaintiff must include consideration of the "costs, safety and functionality of the alternative design."  <u>Branham</u>, 701 S.E.2d at 16.  The jury then conducts a risk-utility test, "weighing the costs and benefits attendant to [the manufacturer's] decision" to use one design over

---

[6] At the January 24, 2017 hearing on SAR's summary judgment motion, Priester appeared to concede that there was no viable design defect claim.  Out of an abundance of caution, the court assesses the viability of the design defect claim as presented in Priester's briefing on the summary judgment motion.

another to determine if the danger associated with the use of the product outweighs the utility of the product.  Id.  In Branham, the Supreme Court of South Carolina warned that a jury question is not created "merely because a product can be made safer."  Id.

SAR's role Cell 90 was to add a redundant air brake system in order to prevent the sliders from moving, and upon testing and commissioning of the platform SAR disabled laser sensors on the sliders, including Slider #2.  ECF No. 88 at 3.  SAR argues that it did not design the platform, and the work that it completed on the redundant air brake system and laser sensors was at the "specific request" of Boeing.  ECF No. 88 at 10.  Thus, SAR argues, it cannot be held liable for a design defect.  The court agrees—while SAR's incomplete commissioning of Cell 90 may have been a deviation from the original design plans for Cell 90, this is evidence of a manufacturing defect and not a design defect.

In his deposition, Ebersole states "there was a commissioning that was not completed, which resulted in the system not being completed to the design."  ECF No. 99, Ex. 4, Ebersole Dep. at 71:20-72:9.  Ebersole notes that SAR's failure to "complete the commissioning" caused, at least in part, the other sliders to continue moving while Slider #2 stopped.  ECF No. 82, Ex. 1, Ebersole Report at 26.  Priester argues that SAR's failure to properly commission Cell 90 left it in a condition that did not meet Boeing's specifications and resulted in the system not being completed to the design—in other words, that if SAR had completed the logic software within Cell 90 to achieve the original design intent then there would have been no communication failure that was a cause of Slider #2's failure to extend.  ECF No. 99,

11

Ex. 4, Ebersole Dep. at 71:20-72:9.  According to Ebersole, Cell 90 had "software and hardware that was still awaiting completion," including "software for making up a complete control and alarm system that would allow [Cell 90] to meet reasonable standards."  ECF No. 99 at 5, Ex. 4, Ebersole Dep., at 35:9-19.

Since SAR is the entity that commissioned this control and alarm system, Priester argues that it has identified sufficient facts to show the existence of a jury question with respect to SAR's liability for design defects in the design of Cell 90. Even accepting Priester's argument that SAR's incomplete commissioning of the logic software in Cell 90 was a deviation from the original design of Cell 90, this presents evidence of a manufacturing defect as opposed to a design defect. Admittedly, courts within this district have noted that the line between a manufacturing defect claim and a design defect claim is somewhat undefined.  See Fisher v. Pelstring, 817 F. Supp. 2d 791, 818 (D.S.C. 2011) ("There is not an abundance of case law in South Carolina about how a manufacturing defect differs from other defects. "), on reconsideration in part (Jan. 11, 2012).  However, to survive summary judgment, it is "crucial" that a plaintiff also demonstrate that a "feasible," or workable, design alternative exists under the circumstances.  See Little v. Brown & Williamson Tobacco Corp., 243 F.Supp.2d 480, 495–96 (D.S.C. 2001) (noting that failure to provide evidence of an alternative design is "fatal to a product liability case" under South Carolina law).  Priester presents no evidence of any feasible design alternative to Cell 90, simply asserting that "if during the commissioning process, SAR had completed the software within Cell 90 to achieve the original design intent," then Mr. Priester's accident could have been avoided.

12

ECF No. 99 at 17. Without more, the court cannot perform a risk-utility analysis of Cell 90.

The arguments that Priester makes on the design defect issue are identical to the ones that it makes on the manufacturing defect issue. Since Priester has not presented evidence of a feasible design alternative to Cell 90, and instead focuses its design defect arguments on how SAR did not complete the commissioning according to the original design specifications, the court grants SAR summary judgment on the design defect claim.

### 3.     Failure to Warn

Third, SAR argues there is no strict liability based on failure to warn. SAR contends that there was an adequate warning for Cell 90 because the platform contained a "large and clear" placard that contained the notice "WARNING OPEN AREAS IN DECK" in large letters at the gate at the top of the staircase for the platform. ECF No. 88 at 11; see also ECF No. 88, Ex. L. Priester counters that while the sign references open areas, it does not mention the possibility of injury due to fall hazards or the relationship of the sliders to potential gaps. ECF No. 99 at 18.

"In order to prevent a product from being unreasonably dangerous, the seller may be required to give a warning on the product concerning its use." Anderson v. Green Bull, Inc., 471 S.E.2d 708, 710 (S.C. Ct. App. 1996). "Generally, the question of the adequacy of the warning is one of fact for the jury as long as evidence has been presented that the warning was inadequate." Brewer v. Myrtle Beach Farms Co., Inc., 2005 WL 7084354, at *3 (S.C. Ct. App. Aug. 30, 2005). A manufacturer need not "refine a product which is made safe for use by an adequate warning so that the

product does not need a warning to be safe." Allen v. Long Mfg. NC, Inc., 505

S.E.2d 354, 357 (S.C. Ct. App. 1998). Finally, a manufacturer is "not required to

warn of dangers or potential dangers that are generally known and recognized" or

those dangers that are open and obvious. Moore v. Barony House Restaurant, LLC,

674 S.E.2d 500, 504 (S.C. 2009) (citing Anderson v. Green Bull, Inc., 471 S.E.2d

708, 710 (S.C. 1996)).

The court finds that SAR has proven Mr. Priester and his team were aware

that the gap existed and the danger that existed because of the gap. ECF No. 88, Ex.

E, Bunch Dep. 121:4-15. Priester argues that Mr. Priester's teammates could not

"recall if there was a posted sign" which told employees not to go out onto the sliders

if they were not all fully extended, ECF No. 99 at 19, Ex. 6 at 81:6-11, and that the

sign contained no caution or warning notes about slider malfunctions, ECF No. 99 at

19. However, under Moore, a manufacturer need not "warn of dangers or potential

dangers that are generally known and recognized." Moore, 674 S.E.2d at 504. SAR

asserts that the failure of Slider #2 to fully extend created an "open and obvious"

danger, which requires no warning under Moore. The court is persuaded by SAR's

argument that a gap presenting the risk of a fall of 18 feet without protective gear is

an "open and obvious" fall hazard. ECF No. 102 at 5. The court finds it particularly

notable that Boeing employees testified that they saw the warning sign "at least fifty

times" per shift. ECF No. 88, Ex. E, Bunch Dep. 133:6-134:5. Therefore, the court

finds that even if, as Priester asserts, Mr. Priester did not have knowledge of the risks

14

posed by the gap, the gap in Slider #2 presented an "open and obvious" danger that

obviates SAR's duty to warn.[7]

### B.    Futuramic's Motion for Partial Summary Judgment as to Priester's Strict Liability Claims

Futuramic brings a motion for partial summary judgment as to Priester's strict

liability claims, alleging that there is no genuine dispute of material fact that: (1) at

the time Cell 90 was delivered and installed at the Boeing facility it did not contain a

---

[7] SAR also argues that Mr. Priester was aware of the failure of Slider #2 and the large gap created by Slider #2's failure to extend, and that Mr. Priester and his teammates discussed that the gap created by the failure of Slider #2 to fully extend was a fall hazard. ECF No. 88, Ex. E, Bunch Dep. 88:15-24; 121:4-15. Because Mr. Priester "disregarded an open, obvious and known danger" and proceeded to use Slider #2, SAR contends that Priester's claims are barred by Section 15-73-20 of the South Carolina code, which provides that:

> If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

S.C. Code Ann. § 15-73-20.   The South Carolina Supreme Court has held that Section 15-73-20 requires a defendant in a products liability action to prove that the plaintiff "unreasonably" made use of the product.  Koester v. Carolina Rental Ctr., Inc., 443 S.E.2d 392, 394–395.  A defense based on the doctrine of assumption of risk requires a showing that the plaintiff "(1) has knowledge of the facts constituting the dangerous condition; (2) knew that the condition was dangerous; (3) appreciated the nature and extent of the danger; and (4) voluntarily exposed herself to the danger". Creighton v. Coligny Plaza Ltd. P'ship, 512 S.E.2d 510, 519 (S.C. Ct. App. 1998) (citing Pryor v. Northwest Apartments, Ltd., 469 S.E.2d 630 (S.C. Ct. App. 1996)).
SAR argues that the court can declare that a plaintiff assumed the risk as a matter of law when the evidence as a whole presents the "sole reasonable inference . . . that the plaintiff freely and voluntarily exposed himself to a known danger which he understood and appreciated."  Wallace v. Owners-Illinois, Inc., 389 S.E.2d 155, 158 (S.C. Ct. App. 1989).  However, in White v. Renaissance Hotel Mgmt. Co., LLC, No.2:14-cv-02866-DCN, 2016 WL 234987, at *3 (D.S.C. Jan. 20, 2016), this court noted that the "defense of assumption of risk 'ordinarily present[s] [a] question[] of fact to be determine by a jury and only rarely become[s] [a] question[] of law for the court to determine."  Accordingly, the court refrains from deciding if Mr. Priester assumed the risk of falling through the gap at the summary judgment stage and leaves this issue to the purview of the jury.

manufacturing defect, design defect, or defective warning; (2) even assuming that

Cell 90 contained a defect, Mr. Priester and his co-workers were aware of the large

opening and the danger that it posed, but used Cell 90 regardless, and that this

assumption of risk bars recovery; (3) third-party SAR modified Cell 90 after it was

delivered and installed at the Boeing facility, and this modification caused Priester's

accident, thus barring any recovery from Futuramic.  ECF No. 75 at 1.  The court

grants Futuramic's motion for summary judgment as it relates to strict liability for

failure to warn and design defect, but denies the motion as it relates to the

manufacturing defect.  As explained more fully in footnote 7, the court refrains from

deciding at the summary judgment stage whether Mr. Priester's alleged knowledge of

the gap arising from Slider No. 2's failure to deploy and the associated risk is

sufficient to bar recovery under S.C. Code Ann. § 15-73-20, finding that this presents

a question of fact best left to the jury.  Finally, the court denies the motion as it relates

to barring Priester's recovery from Futuramic because of third-party SAR's

subsequent and allegedly unforeseeable modification of Cell 90.

### 1.     Manufacturing Defect

Futuramic first argues that there is no genuine dispute of material fact that

Cell 90 did not contain a manufacturing defect at the time it was delivered and

installed at the Boeing facility.  ECF No. 75, Ex. 1 at 11.  Futuramic cites Priester's

own expert, Bartley Eckhardt ("Eckhardt"), arguing that Eckhardt admits that he has

no evidence that Slider #2 failed to work because of a mechanical issue.  ECF No. 75,

Ex. M, Eckhardt Dep. 90:4-7.  Futuramic also cites to Ebersol's opinion that "the

cause of the Slider #2 failure to extend was a communication issue related to SAR's

16

post-delivery modification of Cell 90's programming.  ECF No. 75, Ex. D, Ebersole Dep. 72:17-23.  Finally, Futuramic points to the testimony of its own expert, Bryan R. Durig, who opined that Cell 90 was not defectively manufactured.  ECF No. 75, Ex. L, Durig Report at 3.  Upon a careful review of the record, the court determines that there is a dispute of material fact as to whether Futuramic's delivery of Cell 90 in an incomplete condition to the Boeing facility was at odds with Boeing's descriptive specification for the manufacture of Cell 90, and whether Futuramic's failure to ensure that Cell 90 was complete and free from defects at the time that it was delivered was a cause of Mr. Priester's incident.

Where a plaintiff alleges that a particular product was "defectively manufactured" he must show that the product was manufactured in a different way than originally intended, resulting in a defective condition that was the proximate cause of the injury.  Watson, 699 S.E.2d at 174.  The court finds that Priester has presented sufficient evidence to create a number of genuine issues of material fact whether Cell 90, as manufactured and delivered to Boeing, conformed to its intended design.  Priester argues that Futuramic had agreed to provide the logic software to control the operations of Cell 90 as "part of the contract" between Boeing and Futuramic.  ECF No. 82 at 4.  Instead of fulfilling this obligation to Boeing, Futuramic delivered Cell 90 at the Boeing facility with incomplete software and instead retained another company, Intec, to prepare the programming.  Id. at 4.  Eckhardt's report states that Futuramic "bore a responsibility" to ensure that Cell 90 would be delivered in a condition that was tested and commissioned as laid out in

Boeing's descriptive specifications.[8]  ECF No. 99, Ex. 2, Eckhardt Report at 18.

Adding further support, Ebersole provides an in-depth discussion of the specifications

provided to Futuramic, highlighting the fact that such specifications included

referencing ANSI A92.6.  ECF No. 82, Ex. 1, Ebersole Report at 24.  In a separate

section of his report, Eckhardt again brings up Futuramic's failure to properly design

guards for the "incident area"—which the court assumes is the gap between Slider #2

and the aircraft barrel where Mr. Priester fell through—as a cause of Mr. Priester's

fall.  ECF No. 99, Ex. 2 Eckhardt Report at 18.

In both Futuramic's briefing on the manufacturing defect issue and during the

hearing on its motion, Futuramic relied heavily on the somewhat untenable

assumption that there cannot be a manufacturing defect where there is no mechanical

defect.  However, the court is not aware of—and Futuramic has not cited to—any

South Carolina law that defines a manufacturing defect so narrowly.  Indeed, in

Graves v. CAS Med. Sys., Inc., 735 S.E.2d 650 (2012), the South Carolina Supreme

Court weighed the admissibility of expert testimony in a case where a plaintiffs' strict

liability claim against the manufacturer of a monitor was predicated on the theory that

a software defect caused the monitor's alarm to fail, thus causing their child's death.

---

[8] Eckhardt also opines that Futuramic should have added an interlocking gate that would not open if any of the sliders were not fully extended to the barrel.  ECF No. 75, Ex. M, Eckhardt Rep. at 26.  However, while Futuramic certainly could have added additional safety features to Cell 90, South Carolina courts have noted that "products are not defective simply because they do not have all the optional safety features that could be included."  Moore v. Barony House Rest., LLC, 674 S.E.2d 500, 503 (S.C. Ct. App. 2009).  In any event, even without considering the possible added safety repercussions of an interlocking gate in Cell 90, the court finds that there is a genuine issue of material fact sufficient to preclude summary judgment on the manufacturing defect issue.

To the extent that Futuramic is asking the court to delineate manufacturing defects as occurring only when there is a mechanical defect in a product, the court refuses to issue such a bright-line rule.

Viewing these facts in the light most favorable to Priester, the court finds that Priester has offered enough evidence that Cell 90 did not conform to Boeing's intended specifications and criteria to preclude Futuramic's motion for summary judgment as it relates to the manufacturing defect claim.

### 2.      Design Defect

As explained above in part III.A.2, the court finds that the arguments that Priester makes on the design defect issue are identical to the ones that it makes on the manufacturing defect issue.  Accordingly, the court grants Futuramic summary judgment on the design defect issue.

### 3.      Failure to Warn

Third, Futuramic alleges that there is no defective warning because Cell 90 clearly contained a warning informing users of "open areas" on the elevated platform. ECF No. 75, Ex. 1 at 15.  As the court explained in part III.A.3, there is no genuine dispute that Mr. Priester and his team were aware that the gap existed and the danger that existed because of the gap.  Alternatively, the court finds that even if, as Priester asserts, Mr. Priester did not have knowledge of the risks posed by the gap, the gap in Slider #2 presented an "open and obvious" danger that obviates Futuramic's duty to warn under Moore.[9]

---

[9] Futuramic makes an assumption of risk argument under Section 15-73-20 of the South Carolina Code, arguing that this bars Priester's recovery on the failure to

19

### 4.        Third-Party Modification

Finally, Futuramic argues that Priester's recovery is barred because SAR modified the product after it was delivered and installed at the Boeing facility, and it was SAR's modification that proximately caused Mr. Priester's injury.  ECF No. 75, Ex. 1 at 2.  Futuramic asks the court to grant summary judgment on the third-party modification ground because Cell 90 was not "in essentially the same condition as when it left the hands of the defendant" and the alteration was not foreseeable.  While the court agrees that at the time of Mr. Priester's fall Cell 90 was in a different condition from when Futuramic delivered it to the Boeing facility, it is not persuaded that the alterations that SAR made were not foreseeable—after all, Futuramic delivered Cell 90 without complete logic software, in direct contravention to Boeing's specifications.  Accordingly, summary judgment is denied on the third-party modification ground.

Under S.C. Code Ann. § 15-73-10(1), a seller is subject to liability if the product "reach[es] the user or consumer without substantial change in the condition in which it is sold."  In Jackson v. Bermuda Sands, Inc., 677 S.E.2d 612, 615 (S.C. Ct. App. 2009), the court quoted Section 402A of the Restatement (Second) of Torts to note that:

> "[t]he burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained."

---

warn claim.  As explained above in part III.A.3 addressing SAR's very similar assumption of risk argument, in line with this court's very recent decision in White, the court refrains from deciding if Mr. Priester assumed the risk of falling through the gap and instead leave it to the jury.

South Carolina courts have barred recovery where "it can be shown that a product was (1) materially altered before it reached the injured user and (2) such alteration could not have been expected by the manufacturer or seller." Ervin v. Cont'l Conveyer & Equip. Co., 674 F. Supp. 2d 709, 723 (D.S.C. 2009); see also Claytor v. Gen. Motors Corp., 286 S.E.2d 129, 131 (S.C. 1982) (affirming the grant of a directed verdict to the manufacturer, reasoning "[t]he seller is not liable when he delivers the product in a safe condition, and . . . other causes make it harmful by the time it is consumed.").[10]   However, liability may be imposed "notwithstanding" subsequent alteration where the alteration "could have been anticipated by the manufacturer or seller." Small, 494 S.E.2d at 844; see also Bramlette v. Charter–Medical–Columbia, 393 S.E.2d 914 (S.C. 1990) (holding that the primary wrongdoer's action is legal cause of injury if either the intervening act or the injury itself was foreseeable as natural and probable consequence of that action).   It is here that Futuramic's argument regarding third-party modification fails.

Cell 90 was built and tested at the Futuramic facility and delivered to the Boeing facility in November 2012.   ECF No. 75, Ex. A, Motz Dep. 142:25–143:3. The sliders in Cell 90 are controlled by a control panel, which was installed and programmed by Intec.   ECF No. 75 at 5.   After the installation of Cell 90 at the Boeing facility, Boeing hired SAR to make modifications to Cell 90, including

---

[10] Courts outside of South Carolina have also granted summary judgment in strict liability claims where the subject product was altered.   For example, in Bauerlein v. Salvation Army, 74 A.D.3d 851 (N.Y. 2010), the court found that a personal residential elevator manufacturer was not strictly liable where the elevator fell because the cables had been previously replaced by a maintenance contractor whose installation of U-bolts had caused the accident.

modifications to the computer programming installed by Intec.  Id.  Futuramic argues

that program changes were the cause of Mr. Priester's fatality.  See ECF No. 75, Ex.

1 at 5.  However, the court finds it plausible that Futuramic should have anticipated

that SAR would make subsequent alterations to Cell 90.  Ebersole opines that Cell 90

was intended to "have motor driven sliders that would move toward the fuselage and

provide a surface to stand on that would have no gaps larger than 3" between the end

of a slider and the barrel section."  ECF No. 82, Ex. 1, Ebersole Report at 3.  While

the electrical system in Cell 90 as delivered by Futuramic included motors, drives,

and sensors, it did not include a complete logic system that would move the sliders

when appropriate.  Id. at 24-25.  Eckhardt opines that Futuramic knew, or should have

known, that Boeing workers would attempt to work around a slider that did not fully

deploy or was malfunctioning.  ECF No. 99, Ex. 2, Eckhardt Report at 11.  Indeed, in

December 2012, Boeing contacted Futuramic for urgent help, noting that "[t]he

sliders are not stopping and drive into composite material and the metallic barrel cart

ending.  Need help immediately to troubleshoot and resolve this issue on site Boeing

South Carolina."  ECF No. 82, Ex. 11, Boeing email.  This demonstrates that, as late

as December 2012, Futuramic was aware that Cell 90's logic system was in an

incomplete condition, and that as a result the sliders were malfunctioning.

When, as here, there is a "legitimate dispute" regarding foreseeability of

subsequent modification, South Carolina courts have held that the resolution of the

dispute is for a jury to decide.  Ervin, 674 F. Supp. at 724.  For example, in Ervin the

court found that there was a jury question whether the accumulation of cotton at

transfer points between conveyer systems was a common problem that the defendant

had knowledge of, where there was evidence in the record to indicate that the conveyer was exhibiting this problem since the initial installation.  Id. at 724.  Like the transfer points in the cotton conveyer system in Ervin, Futuramic had knowledge of, if nothing else, the incomplete logic system in Cell 90—both at the time that it delivered Cell 90 to the Boeing plant and in December 2012, when Boeing contacted Futuramic noting that an "urgent" correction was needed.  ECF No. 82, Ex. 11.

Based on the record, the court cannot determine that it was unforeseeable, at the time that Cell 90 was installed at the Boeing facility, that future modifications would be made.  The court finds that Priester has produced enough evidence that Futuramic knew—or should have known—by delivering the platform in an incomplete condition without a functional logic system another entity would be responsible for completing the logic.  Therefore, the court finds that a jury question exists as to whether it was foreseeable that SAR would make changes to the Cell 90 programming—including "modifications of slider brake controls," changes that allowed for "additional manual control" of the sliders, and defeating the sensors that were located on the ends of the slide—after Futuramic delivered Cell 90.  ECF No. 82, Ebersole Rep. at 4.  Accordingly, summary judgment is denied on the third-party modification ground.

### C.  Capital Welding's Motion for Complete Summary Judgment

Capital Welding[11] contends that in addition to all of the reasons supporting Futuramic's motion for partial summary judgment on Priester's strict liability claims,

---

[11] Capital Welding is a subsidiary of Futuramic and was the "manufacturer" or "supplier" and its intended role in the "design, manufacture, realization and

it is entitled to summary judgment on all of Priester's claims because it did not breach

any duty of care owed to Priester.  ECF No. 75 at 2–3.  The court grants Capital

Welding's motion for summary judgment as it relates to strict liability for failure to

warn and design defect, but denies the motion as it relates to the manufacturing

defect.[12]  The court once again refrains from deciding at the summary judgment stage

whether Mr. Priester's alleged knowledge of the gap arising from Slider #2's failure

to deploy and the associated risk is sufficient to bar recovery under S.C. Code Ann.

§ 15-73-20.  Finally, the court denies Capital Welding's motion for summary

judgment as it relates to the negligence claim.

Capital Welding's sole argument on Priester's negligence claim is contained

in a footnote which states that "Capital Welding is a separate and distinct corporate

---

commissioning of [Cell 90] was to provide 'equipment' or 'services[.]"  ECF No. 82
at 34.  Futuramic and Capital Welding are distinct corporate entities.  However, as an
initial matter, Futuramic and Capital Welding are both referred to as "Futuramic" in
the briefing on this matter, making it difficult to delineate what argument applied to
which entity.  For one, Futuramic and Capital Welding filed their motion—entitled
"Defendants Futuramic and Capital Welding's motions for summary judgment"—and
reply—entitled "Defendants Futuramic Tool & Engineering Company and Capital
Welding, Inc.'s Reply"—together.  Moreover, neither the motion nor the reply
includes substantive and specific arguments as to Capital's role in this matter.  The
court attempts to differentiate the arguments that apply to Capital, but it cannot—nor
should it have to—make Capital's arguments for it.  See, e.g., Minemyer v. B–Roc
Representatives, Inc., 695 F. Supp. 2d 797, 809 (N.D. Ill. 2009) ("[T]his is an
adversarial system.  It is not a court's task to research legal arguments on a party's
behalf. . . ."); Polk v. Sears, Roebuck, and Co., 2012 WL 1640708, *3 (S.D. Ala. May
8, 2012) ("It is well-established that courts cannot make a party's arguments for it or
'fill in the blanks' on that party's behalf.").
      [12] The briefing on Capital Welding's motion for summary judgment as to
Priester's strict liability claims is identical to Futuramic's briefing the same claims.
Instead of reiterating its analysis as to why the motion is granted as to the design
defect and failure to warn claims but denied as to the manufacturing claims, the court
refers Capital Welding to the earlier sections of this order discussing the strict
liability claims in more depth.

entity that performed the fabrication work on Cell 90.  There is no evidence the Cell 90 fabrication work was defective or in any way caused the accident.  Thus, Capital Welding is entitled to summary judgment as to all of [Priester's] claims."  ECF No. 75 at 9 n. 8.  This is insufficient for the court to decide a summary judgment motion. The court reiterates the threshold rule for summary judgment that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(e)).  As the moving party, Capital Welding bears the initial burden to show the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  It has failed to do so.  A footnote does not a viable summary judgment argument make, especially in a case as complex as this. Accordingly, the court denies Capital Welding's summary judgment motion.[13]

---

[13] In a footnote, Priester argues that the duties owed by Futuramic, which have not been contested, are also attributable to Capital Welding because the joint activities of Capital Welding and Futuramic satisfy the agency test as they are "an amalgamation of corporate interests, entities, and activities so as to blur the legal distinction between the corporations and their activities."  ECF No. 82 at 34 n. 12 (quoting Kincaid v. Landing Dev. Corp., 344 S.E.2d 869, 874 (S.C. Ct. App. 1986)). At the hearing it appeared that Priester had all but abandoned this argument.  In any event, the court refrains from making any findings on the corporate amalgamation argument, as it has not been adequately briefed by Capital Welding and the negligence claim can be decided without considering if a parent company should be held liable in place of a subsidiary.

## IV.   CONCLUSION

For the reasons set forth above, the court: (1) **GRANTS IN PART AND DENIES IN PART** Futuramic's motion for partial summary judgment as to Priester's strict liability claims, **GRANTING** the motion as to Priester's strict liability on the failure to warn claim and design defect claim but **DENYING** the motion as to the manufacturing defect claim;  (2) **GRANTS IN PART AND DENIES IN PART** SAR's motion for partial summary judgment as to Priester's strict liability claims, **GRANTING** the motion as to Priester's strict liability on the failure to warn claim and the design defect claim but **DENYING** the motion as to the manufacturing defect claims; and (3) **GRANTS IN PART AND DENIES IN PART** Capital Welding's motion for complete summary judgment as to all of Priester's claims, **GRANTING** the motion as to Priester's strict liability on the failure to warn and design defect claims but **DENYING** the motion as to the manufacturing defect and negligence claims.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 27, 2017**
**Charleston, South Carolina**

26